USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 29, 2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

KIM MORTIMER and C.S.,                              :
                                                    :
                              Plaintiffs,           :
                                                    :
              v.                                    :
                                                    :
CITY OF NEW YORK; CHILDREN'S                        :
VILLAGE; NEW YORK CITY                              :
ADMINISTRATION FOR CHILDREN'S                       :
SERVICES ("ACS") CASEWORKER                         :
BEVERLY BOOKER, in her individual and              :
official capacity; ACS CASEWORKER                   :
BEVERLY WILSON, in her individual and              :
official capacity; ACS INVESTIGATIVE               :
CONSULTANT KEITH HAYMES, in his                    :        15 Civ. 7186 (KPF)
individual and official capacity; ACS              :
CASEWORKER RAY SALINAS, in his                     :        OPINION AND ORDER
individual and official capacity; ACS              :
SUPERVISOR JACQUELINE CALDWELL,                    :
in her individual and official capacity; ACS       :
CASEWORKER KATHERINE VARGAS, in                    :
her individual and official capacity; ACS          :
CASEWORKER MARLENE BARNES, in her                  :
individual and official capacity; ACS              :
SUPERVISOR GLENDORA OSBORNE, in                    :
her individual and official capacity; ACS          :
SUPERVISOR MYRIAM CASTAN, in her                   :
individual and official capacity; ACS              :
SUPERVISOR KIM VORHEES, in her                     :
individual and official capacity; ACS              :
SUPERVISOR SHARLENE BROWNE, in her                 :
individual and official capacity;                  :
JOHN/JANE DOE ACS SUPERVISORS 1-3;                 :
CHILDREN'S VILLAGE CASE WORKER                     :
SHELLEY WHITE, in her individual and               :
official capacity; CHILDREN'S VILLAGE              :
PHYSICIAN DOUGLAS WAITE, in his                    :
individual and official capacity; NYPD             :
OFFICER ANCION, in his individual and              :
official capacity; NYPD HOUSING OFFICER            :
JANET CARABALLO, in her individual and             :
official capacity; NYPD OFFICER ARRIAGA,           :

in his individual and official capacity; :
NYPD OFFICER LOPEZ, in her individual :
and official capacity; NYPD OFFICER :
STENA, in his individual and official :
capacity; NYPD OFFICER SHELLEY, in his :
individual and official capacity; NYPD :
OFFICER KYLE HURST, in his individual :
and official capacity; NYPD OFFICER JOE :
DURROWES, in his individual and official :
capacity; JOHN/JANE DOE NYPD :
OFFICERS 1-7; ASSISTANT DISTRICT :
ATTORNEY TIMOTHY DUDA, in his :
individual and official capacity; :
  :
                      Defendants. :
  :
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

      Plaintiff Kim Mortimer and her son C.S.[1] (together, "Plaintiffs") bring this

civil rights action under 42 U.S.C. § 1983 against the City of New York (the

"City"), several caseworkers and supervisors at the Administration for

Children's Services (the "ACS Defendants"), officers of the New York City Police

Department (the "NYPD Defendants"), Children's Village and two of its

employees (the "Children's Village Defendants"), and Assistant District Attorney

("ADA") Timothy Duda (collectively, "Defendants").  Plaintiffs bring these claims,

voiced primarily through Mortimer, to seek redress for alleged constitutional

violations stemming from a series of events in 2014 that led first to C.S.'s

arrest and removal from Mortimer's home and ultimately to C.S.'s flight to

Germany and Mortimer's arrest thereafter.

---

[1]      Plaintiff C.S., son of Plaintiff Kim Mortimer, was a minor at the time of the events
relevant to this dispute.  Therefore, the Court will refer to him by his initials.

Defendants hold a different view of these events, and now move as follows: (i) the ACS Defendants, (ii) the Children's Village Defendants, and (iii) ADA Duda separately move to dismiss under Federal Rule of Civil Procedure 12(b)(6); (iv) the Children's Village Defendants also move to dismiss under Rule 12(b)(1); and (v) the NYPD Defendants move for judgment on the pleadings under Rule 12(c) or, in the alternative, for summary judgment under Rule 56(a). At this procedural juncture, and with limited exceptions discussed in this Opinion, the Court must accept the well-pleaded allegations in Plaintiffs' Third Amended Complaint ("TAC"). Accordingly, and as detailed herein, the motions are granted in part and denied in part.

## BACKGROUND[2]

### A. Factual Background

#### 1. Plaintiffs Arrive in New York and Are Investigated by ACS

Mortimer and her teenage son C.S. arrived in New York in June 2013 from London, having moved here to be closer to Mortimer's mother (and C.S.'s

---

[2] This Opinion draws facts from Plaintiff's Third Amended Complaint (Dkt. #93 ("TAC")) and, in light of Plaintiffs' *pro se* status, from Plaintiffs' opposition brief and the documents appended thereto. *See Nielsen* v. *Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("[A] *pro se* litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid claim."); *Walker* v. *Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion."); *Reeves* v. *City of Yonkers*, No. 16 Civ. 2223 (KMK), 2017 WL 2275025, at *3 (S.D.N.Y. May 24, 2017) (holding that a court may consider factual allegations and documents submitted with a *pro se* litigant's opposition papers). The Court has considered the parties' briefing and will refer to the submissions as follows: to ADA Duda's opening brief (Dkt. #105) as "Duda Br." and reply brief (Dkt. #133) as "Duda Reply"; to the ACS Defendants' opening brief (Dkt. #107) as "ACS Br." and reply brief (Dkt. #140) as "ACS Reply"; to the NYPD Defendants' opening brief (Dkt. #113) as "NYPD Br." and reply brief (Dkt. #132) as "NYPD Reply"; to the Children's Village Defendants' opening brief (Dkt. #124) as "CV Br." and reply brief (Dkt. #138) as "CV Reply"; and to Plaintiffs' consolidated opposition to Defendants' motions (Dkt. #127) as "Pl. Opp."

grandmother). (TAC ¶¶ 31-34, 39). In November 2013, Plaintiffs "had a verbal dispute about leaving New York" — C.S. wanted to return to Europe, but Mortimer needed to stay in New York to help her mother. (*Id.* at ¶¶ 37-38). Following this dispute, C.S. "attempted to [break] into his home" when Mortimer was not there in order to "get … his vital documents" that would permit him to leave New York. (*Id.* at ¶ 40). For this, C.S. was "arrested but not charged and ACS was notified." (*Id.* at ¶ 41). On December 9, 2013, ACS Caseworker Katherine Vargas "reported [ ] Mortimer as an abuser" and assigned ACS Caseworker Ray Salinas to investigate. (*Id.* at ¶¶ 42-44). Plaintiffs allege that Salinas interviewed C.S. alone, without Mortimer's knowledge or permission, on December 9, 2013; December 10, 2013; January 5, 2014; and February 4, 2014. (*Id.* at ¶¶ 45-49, 58, 77-78, 101). Plaintiffs clarify in their opposition brief that Salinas's investigation was conducted by order of Family Court Judge Adetokunbo O. Fasanya, and that "[C.S.'s] grandmother initiated [c]ustody/[v]isitation [p]roceedings against Mortimer[.]" (Pl. Opp. 3).

According to the TAC, Salinas reported in his file that C.S. told him that he wanted to live with his grandmother and that Mortimer "slapped him once for saying the word 'whatever' multiple times," but that C.S. also "changed his mind often with respect to his ideal living situation," stating later that he wished to live with his father in Spain and, eventually, that he wanted to remain with Mortimer. (TAC ¶¶ 52-54, 67-68). Salinas also interviewed C.S.'s grandmother about allegations of "excessive corporal punishment," which

allegations Plaintiffs vigorously deny. (*Id.* at ¶¶ 50, 56; *see, e.g.*, *id.* at ¶ 55). Plaintiffs state that C.S.'s grandmother told Salinas that Plaintiffs had disputes over C.S.'s performance in school, but that she "had never seen [ ] Mortimer hit [C.S.]; that she had never seen any marks on [C.S.]; and that if she ever did see marks on [C.S.] she would report it." (*Id.* at ¶ 57).

Plaintiffs allege that Salinas told C.S. that C.S. "would be 'better off' living and remaining with his father … in Spain," despite Salinas having never met or spoken to C.S.'s father and having "no factual knowledge of whether [C.S.'s father] had the financial means, emotional maturity[,] and psychological stability to be an appropriate resource for his son[.]" (TAC ¶¶ 69-71). On December 13, 2013, Mortimer confronted Salinas "about the inappropriateness of his comments," and Salinas denied making them. (*Id.* at ¶¶ 72-73). Mortimer then filed a written complaint against Salinas that she sent to ACS Caseworker Vargas and ACS Supervisor Vorhees. (*Id.* at ¶ 74). Plaintiffs allege that "Vorhees was extremely unprofessional in her handling of" the complaint, but do not explain how so. (*Id.* at ¶ 75). Ultimately, Plaintiffs allege, C.S. returned to live with Mortimer "without any ACS intervention." (*Id.* at ¶ 76).[3]

On December 16, 2013, Salinas interviewed Mortimer and told her that she was required to register with the New York City Department of Education if

---

[3]     Though Plaintiffs allege that C.S. returned to Mortimer's home, the TAC is devoid of any factual allegations explaining when C.S. left Mortimer's home or the circumstances under which he left. The TAC indicates that C.S. was living with his grandmother at this time, but it is unclear for how long or whether ACS was involved in the decision that C.S. stay with his grandmother. (*See* TAC ¶ 52 ("Salinas reported in his first interview with [C.S.], that [C.S.] told him that he wished to *continue* living with [his grandmother]." (emphasis added))).

she wished to homeschool C.S. (TAC ¶ 60). With Salinas's help, Mortimer

filled out the registration papers. (*Id.* at ¶ 62). Salinas told her that she would

have 30 days to complete the process, and Plaintiffs allege that Mortimer

complied. (*Id.* at ¶¶ 64-65). Salinas returned to Plaintiffs' home on February 4,

2014, to ascertain whether Mortimer had completed the registration process.

(*Id.* at ¶ 97). Plaintiffs told Salinas that Mortimer had filled out the forms;

Salinas interviewed C.S. in private and then left the home. (*Id.* at ¶¶ 98-101).

On March 6, 2014,[4] Vargas instructed Salinas to "indicate[] the case for

inadequate guardianship and educational neglect," as well as "[l]acerations,

[b]ruises, [w]elts and excessive corporal punishment." (TAC ¶¶ 79, 88).[5]

Plaintiffs allege that C.S.'s exemplary standardized test scores belie any

allegation of educational neglect. (*Id.* at ¶¶ 81-87). Mortimer claims not to

have been notified that she was the subject of these allegations, but only to

have learned later that the charges had been deemed unfounded. (*Id.* at ¶¶ 80,

89-90, 119). Plaintiffs allege that "Vargas … and Vorhees were directly

responsible for creating the false narrative against [ ] Mortimer," by, among

other things, instructing Salinas to accuse Mortimer of neglect and generate a

file against her. (*Id.* at ¶¶ 91-94). The "fabrications" in this file, by Plaintiff's

telling, "set off a chain of events" that (i) resulted in further lies that were used

---

[4]     Elsewhere in the TAC, Plaintiffs suggest that Salinas filed these allegations on
        February 6, 2014. (TAC ¶ 105-06). Because the precise date is immaterial to resolution
        of the instant motions, the Court need not dwell on this discrepancy.

[5]     In ACS parlance, an "indicated" report of abuse or neglect means that the caseworker
        has found evidence to support a claim that a child has been abused or neglected. In
        this setting, the opposite of "indicated" is "unfounded."

to justify the unlawful removal of C.S. from Mortimer's custody, (ii) "established a global case 'theme' of [ ] Mortimer as a physical abuser of [C.S.]," and (iii) "signaled that [Plaintiffs'] relationship should receive a high level of intervention going forward." (*Id.* at ¶¶ 95-96). Plaintiffs allege that, throughout this time, C.S. was adequately cared for by Mortimer and her mother. (*Id.* at ¶ 110).

### 2. Plaintiffs' April 2014 Dispute Leads to C.S.'s Arrest

On April 12, 2014, about one month after allegations of neglect were first made against Mortimer, she and C.S. had a dispute when C.S. returned home past his curfew at 2:30 a.m. (TAC ¶¶ 120-23). Plaintiffs allege that Mortimer was upset with C.S. and that she "was distracted by their exchange and the door accidentally closed on her finger." (*Id.*). Mortimer went around the corner to her friend's building and asked the doorman to call 911 because she "needed stitches." (*Id.* at ¶ 124). Defendant Officers Durrowes and Hurst responded to the call, and Mortimer explained to them that she and C.S. had a dispute during which a door had accidentally closed on her finger. (*Id.* at ¶ 126).

Mortimer was eventually taken to a hospital and made a formal statement to Hurst and Durrowes while she was there. (TAC ¶ 127). Plaintiffs allege that Durrowes "recorded in his incident report that [C.S.] had wielded no weapon against [Mortimer]." (*Id.* at ¶ 129). Durrowes and Hurst are also alleged to have interviewed C.S. at the 24th Precinct without reading him his *Miranda* rights, during which interview they "falsely told [C.S.] that [ ] Mortimer had accused him of cutting her finger[.]" (*Id.* at ¶¶ 130-31). Plaintiffs further

allege that this false accusation "prompt[ed C.S.] to make negative statements [about] Mortimer," including that she "cut herself on the finger in order to now falsely blame [C.S.]" for her injury. (*Id.* at ¶¶ 131-33). Durrowes and Hurst allegedly used unspecified improper methods to induce C.S. to confess to injuring Mortimer. (*Id.* at ¶ 136).

Following this incident, C.S. was "arrested and charged with [seven] counts of multiple offenses[,] one of which was [third degree] assault" during which he possessed a "deadly weapon, dangerous instrument[,] and what appeared to be a pistol and other firearm." (TAC ¶¶ 137-38). Plaintiffs allege that Hurst "submitted his false version of [C.S.'s] confession to the New York County District Attorney's Office" and that Durrowes failed to intervene "to correct this fabrication." (*Id.* at ¶¶ 144-45).

After C.S. was arrested, Mortimer set out to look for him. On April 13, 2014, she went to the 24th Precinct, but officers there told her that C.S. had been "taken to the Manhattan[] Central Booking Detention Cent[er] ['MDC'] to be processed, fingerprinted, and videotaped." (TAC ¶¶ 148-49). When Mortimer arrived at the MDC, she was told that C.S. "had been transferred to the New York City Criminal Courthouse." (*Id.* at ¶ 164). Once there, Mortimer learned that C.S. was being arraigned on "seven counts of assault with a dangerous weapon and ... a deadly firearm." (*Id.* at ¶ 168).

Plaintiffs allege that, also on April 12, 2014, ACS employees Woods, Vazquez, and Baker "unlawfully entered" Mortimer's home and that, even though Mortimer spoke to them, they did not tell her that C.S. had been moved

from the 24th Precinct to the MDC and, later, to the courthouse "to be arraigned ... and sent to [Rikers] Island." (*Id.* at ¶¶ 151-59).[6]

### 3. C.S. Is Interviewed by ADA Duda and an Order of Protection Is Issued

Plaintiffs allege that ADA Duda interrogated C.S. without reading him his *Miranda* rights and without an attorney, and proceeded to "unlawfully videotape[]" him. (TAC ¶¶ 172-74). ADA Duda then reported to ACS employee Woods "that [C.S.] was arrested ... for assaulting [ ] Mortimer," and that C.S. "was being physically abused for performing poorly in school[] and performing poorly in his extracurricular activities for the last three years." (*Id.* at ¶¶ 175-77). Plaintiffs allege that these accusations conflict with Mortimer's statements that she never abused C.S. and that he excelled in his home-schooling program and extracurricular activities. (*Id.* at ¶¶ 178-80).

Plaintiffs further allege that ADA Duda reported the following to ACS regarding the April 12, 2014 incident: (i) C.S. went to Mortimer's home that day

---

[6]   ACS employees Woods, Vazquez, and Baker are not named as Defendants in this case, and the Court understands this omission to be deliberate. By way of background, Plaintiffs' First and Second Amended Complaints named as Defendants "John/Jane Doe NYC ACS Supervisors 1-3," and made certain allegations concerning their conduct. Before the filing of the TAC, the Court re-opened the *Valentin* Order at Plaintiffs' request. (Dkt. #87-89). Plaintiffs requested clarification of the names of two ACS employees, but did not indicate there were any other ACS employees still to be identified. (Dkt. #87). At the time the TAC was filed, Plaintiffs added a number of new allegations and new parties; these additions included allegations concerning the conduct of Woods, Vazquez, and Baker. The conduct attributed to these three individuals is different from that which had been attributed to "John/Jane Doe ACS Supervisors 1-3," and the Court understands that to be the reason why those Doe Defendants remain in the caption. (Dkt. #93). In sum, because Plaintiffs have modified their case captions as they have received information pursuant to the *Valentin* Order, and because there are other individuals named in the TAC who are not named as Defendants, the Court understands that Plaintiffs are not raising any claims against ACS employees Woods, Vazquez, or Baker.

"to retrieve his clothing" but Mortimer "would not let him in"; (ii) Mortimer "was holding pliers in her hand"; and (iii) Mortimer "cut herself with the pliers." (TAC ¶¶ 181-87). Plaintiffs assert that these statements were false when made by ADA Duda. (*Id.*). Based on this account of the April 12, 2014 events, ADA Duda obtained an order of protection to keep C.S. from entering Mortimer's home. (*Id.* at ¶ 191). Mortimer objected to the order and states that it was "manifestly unreasonable" and forced C.S. to reside outside her home, thereby infringing on Plaintiffs' "family-togetherness rights." (*Id.* at ¶¶ 192-95, 199). ADA Duda also fostered the "global case 'theme'" that Mortimer had physically abused C.S., and "unlawfully signaled that [Plaintiffs'] relationship should receive a high level of intervention going forward." (*Id.* at ¶¶ 202-03). Plaintiffs allege that the order of protection was eventually vacated and C.S. returned to Mortimer's home, though Plaintiffs do not specify when C.S. returned. (*Id.* at ¶ 204).

### 4.    ACS Continues to Visit Plaintiffs in April 2014

On April 14, 2014, following ADA Duda's report to ACS, Defendant ACS Caseworker Wilson was assigned to investigate. (TAC ¶¶ 205-06). She interviewed C.S. alone and without Mortimer's knowledge or consent. (*Id.* at ¶¶ 206-07). Wilson visited Mortimer's home and "stated she wanted to have a family meeting with C.S.," but Mortimer explained that would not be possible in light of the order of protection. (*Id.* at ¶¶ 208-10). Plaintiffs allege that Wilson "insisted" they have the meeting, but Mortimer stated she would not violate the order of protection. (*Id.* at ¶¶ 211-12). When Wilson reached out to

ADA Duda to inquire about the order of protection, he stated he was not aware of any such order but, Plaintiffs claim, he reiterated to Wilson that C.S. had told him that Mortimer had cut her own finger during the April 12, 2014 incident in an effort to frame C.S. (*Id.* at ¶¶ 213-15). Plaintiffs allege that ADA Duda failed to explain that C.S. had been coerced into making that statement and, further, that Wilson had noted in her file that she found C.S. to be "misleading." (*Id.* at ¶¶ 216-17).

Plaintiffs allege that Wilson failed to conduct an independent investigation of ADA Duda's claim, did not give appropriate weight to Mortimer's statement that the finger injury was an accident, and unreasonably accepted ADA Duda's and the NYPD Defendants' "unreliable and unreasonable" findings, which Wilson either knew or should have known were false. (TAC ¶¶ 218-21). On June 5, 2014, and July 8, 2014, Wilson interviewed C.S. alone and without Mortimer's knowledge or consent. (*Id.* at ¶¶ 223, 225). Thereafter, "Wilson substantiated an abuse and neglect finding" that was "objectively unreasonable and … implausible based on the record." (*Id.* at ¶¶ 227-28). Plaintiffs allege that ACS Defendants Barnes, Osborne, Browne, Castan, Booker, Vorhees, Vargas, and Caldwell were Wilson's supervisors and likewise "failed to properly investigate the facts." (*Id.* at ¶¶ 229-30).

**5. Plaintiffs' July 2014 Dispute Leads to C.S.'s Removal from Mortimer's Home**

On or about July 23, 2014, Plaintiffs "had a quarrel about [ ] Mortimer's rule that [C.S.] could not access his computer until he finished certain housework." (TAC ¶ 231). "[C.S.] called 911 to report that [ ] Mortimer's

computer-access rule" amounted to "theft of his property." (*Id.* at ¶ 232). Defendant Officer Caraballo and a second, unnamed officer responded to the call. (*Id.* at ¶ 233). Plaintiffs allege that, during their dispute, Mortimer demanded that C.S. "give back to her the Oxford shirt he was wearing," that C.S. complied, and that Plaintiffs agreed that C.S. would stay with his grandmother "for a time." (*Id.* at ¶¶ 234-36). Officer Caraballo "walked [C.S.] across the street and personally delivered him" to his grandmother's home. (*Id.* at ¶ 237). Plaintiffs allege that Caraballo later "called ACS" and "falsely reported" that Mortimer "had stripped [C.S.] down to his underwear." (*Id.* at ¶¶ 238-39). On July 23, 2014, and July 24, 2014, ACS Caseworker Wilson again interviewed C.S. outside Mortimer's presence and Osborne allegedly approved Wilson's conduct. (*Id.* at ¶¶ 241-44).

On August 1, 2014, Wilson initiated proceedings in Family Court "to remove C.S. from [ ] Mortimer's custody" and to have him "place[d] on non-kinship foster care." (TAC ¶ 246). Plaintiffs allege that Wilson's actions were approved by her supervisors Caldwell and Booker, and that Wilson failed to notify Mortimer about the proceedings. (*Id.* at ¶ 248). Plaintiffs allege that Wilson's notes reflect that she spoke to Mortimer and put a notice "on the letterbox" in Mortimer's building on July 31, 2014, but assert that her notes are false and that no such notice was given. (*Id.* at ¶¶ 249-51). In consequence of Wilson's failure, Mortimer did not attend the hearing. (*Id.* at ¶ 252).

Prior to the hearing, Wilson, Booker, and Caldwell met with C.S. to devise a "safety plan"; they excluded C.S.'s grandmother from this conversation, even though she had accompanied him to Family Court that day, and also excluded C.S.'s attorney. (TAC ¶¶ 253-54). Wilson, Booker, and Caldwell allegedly told C.S. that Mortimer "had been notified of the [c]onference and the [h]earing but did not want to come." (*Id.* at ¶ 256). Plaintiffs allege that C.S. told Wilson, Booker, and Caldwell "that he wanted to live with his father ... in Spain," and that Wilson, Booker, and Caldwell responded by telling C.S. that "he would go to jail if he tried to return to live with" his mother, thereby coercing him to say that he wanted to be placed in foster care while arrangements were made for him to live with his father. (*Id.* at ¶¶ 257-59). Plaintiffs allege that Wilson, Booker, and Caldwell improperly relied on C.S.'s statements alone and did not solicit the views of other family members in reaching their determination that "Mortimer had mental health issues." (*Id.* at ¶¶ 260-61; *see also id.* at ¶¶ 262-64). Plaintiffs further allege that Wilson, Booker, and Caldwell failed to consider the possibility of placing C.S. with his grandmother or with a friend of the family. (*Id.* at ¶¶ 265-66).

The petition seeking removal of C.S. from Mortimer's custody "included an allegation of a slap," but failed to clarify that "Salinas'[s] records also indicated the allegation was unfounded." (TAC ¶ 268). More broadly, Plaintiffs allege that Wilson — along with her supervisors Booker and Caldwell — knew that "Salinas had concluded that the [slap] allegation was unfounded," and that C.S. had been found to be "manipulative" and "misleading," but

nonetheless commenced removal proceedings without probable cause and with unverified evidence. (*Id.* at ¶¶ 267-71).

Plaintiffs allege that at the August 1, 2014 proceeding before Family Court Judge Susan Knipps, Wilson and Caldwell gave the following false and unsubstantiated testimony: (i) "Mortimer suffered from mental illness and was mentally unstable"; (ii) Mortimer failed to take "psychotropic medication"; (iii) Mortimer "had purposely cut herself when she was upset with her son, and then blamed her son"; (iv) C.S. could not be placed with his grandmother because an uncle who had an "unsafe alcohol problem" lived there; and (v) Wilson had provided Mortimer with notice of the hearing. (TAC ¶¶ 273-86). Wilson and Caldwell gave this testimony "to persuade Judge Knipps that [C.S.] was in imminent danger." (*Id.* at ¶¶ 278-82). But Wilson "later testified … that she had not properly investigated the facts in her petitions" and that she had "only taped a notice to a mailbox in [Mortimer's] building." (*Id.* at ¶¶ 281, 286). Plaintiffs allege that Wilson's actions were approved by ACS Supervisors Barnes, Osborne, Browne, Castan, Booker, and Caldwell. (*Id.* at ¶ 287).[7]

On August 11, 2014, Mortimer discovered "a summons on the floor of her building about the Family Court proceedings"; the "summons did not say that [C.S.] had already been placed into non-kinship foster care, only that the

---

[7]     Following this proceeding, the Family Court ordered that C.S. be placed in non-kinship foster care. (TAC ¶ 288). Eventually, on July 17, 2015, "the neglect proceeding against [ ] Mortimer was dismissed by the presiding [F]amily [C]ourt judge" on the basis that "the City had failed to prove by a preponderance of the evidence that [ ] Mortimer had neglected her son, [C.S.] at any point." (*Id.* at ¶ 289). Plaintiffs allege that the Family Court "held that [ ] Wilson and NYPD Officer Caraballo had both given evidence that was incorrect, and based on little or no evidence." (*Id.* at ¶ 290).

possibility existed if [ ] Mortimer failed to appear on August 11, 2014." (TAC ¶¶ 293-94). Plaintiffs allege that Mortimer "entered an appearance in the [F]amily [C]ourt proceedings" on August 11, 2014, and went to the 24th Precinct to ask about C.S.'s whereabouts. (*Id.* at ¶¶ 295-96). Once there, Mortimer was informed that C.S. had "been remanded to Children's Village Foster Home." (*Id.* at ¶ 297). On August 22, 2014, Mortimer "received an email from her attorney confirming that [C.S.] had been remanded into foster care." (*Id.* at ¶ 298).

### 6. C.S. Is Placed in Foster Care but Absconds to Germany

On August 1, 2014, C.S. was placed in foster care by Shelley White, a caseworker at Children's Village. (TAC ¶¶ 299-300). White visited Mortimer on August 11, 2014, and Mortimer told White that "under no circumstances were psychological tests to be performed on [C.S.]" and that "no vaccinations or medication was to be administered to [C.S.]" (*Id.* at ¶¶ 303-05). Plaintiffs allege that, earlier that year, "[o]n January 29, 2014[,] Salinas noted that [C.S.] was current on his immunizations." (*Id.* at ¶ 66). Mortimer also sent emails and letters to Children's Village reiterating that no vaccinations or medications were to be given to C.S. (*Id.* at ¶ 306).

Despite Mortimer's entreaties, Children's Village obtained C.S.'s medical and educational records without Mortimer's consent — which records allegedly would have shown that C.S. was already immunized — and Dr. Waite administered eight vaccinations to C.S. and prescribed medication. (TAC ¶¶ 307-15). Dr. Lubliner, who is not a party to this action, also "performed

psychological tests on [C.S.]" (*Id.* at ¶ 316).  And Children's Village Caseworker White and ACS Caseworker Wilson interviewed C.S. without Mortimer's consent.  (*Id.* at ¶ 317).  Plaintiffs further allege that Children's Village was aware that C.S. "may have suffered from mental illness and suicidal tendencies," and that "Mortimer believes that [C.S.] was sexually assaulted at the Children's Village holding facility."  (*Id.* at ¶ 319).

On August 27, 2014, C.S. was placed in a foster home on East 128th Street between Park Avenue and Lexington Avenue in Manhattan, which Plaintiffs allege was "unsafe and unhealthy," with the foster home located adjacent to a drug rehabilitation facility.  (TAC ¶¶ 320-21).  Plaintiffs allege that C.S.'s foster family should have known about C.S.'s mental health issues and suicidal tendencies and that they permitted C.S. to "wander the … streets and … return late at night[.]"  (*Id.* at ¶ 323).  On August 30, 2014, C.S. left his foster home and boarded a flight to Germany.  (*Id.* at ¶¶ 325-26).

### 7. Mortimer Is "Harassed" and Arrested

Plaintiffs allege that after C.S. left for Germany, Children's Village — specifically Caseworker White — "continued to harass [ ] Mortimer," and that this harassment was "racially motivated."  (TAC ¶¶ 328-29).  Namely, White entered Mortimer's home without her consent eight times in September 2014 and intercepted Mortimer's emails, phone calls, postal mail, and "other electronic mediums" from September to December 2014 without consent or a

warrant.  (*Id.* at ¶¶ 330-31).[8]  Plaintiffs state that, on September 17, 2014, White "intercepted, signed and opened a FedEx package[] addressed to [ ] Mortimer."  (*Id.* at ¶ 332).  The next day, the Family Court ordered Mortimer to turn over her passport and not leave New York or the United States for "over 365 days."  (*Id.* at ¶ 333).  Plaintiffs allege that White insisted on overseeing Mortimer as she surrendered her passport and "threatened [ ] Mortimer with force and incarceration if she refused to cooperate."  (*Id.* at ¶¶ 334-36).

On September 2, 2014, the Family Court held an emergency conference at which White and Mortimer were present and during which "the Family Court issued a 'pick-up' warrant for [C.S.'s] arrest."  (TAC ¶¶ 337-38).[9]  Plaintiffs allege that no warrant was issued for Mortimer's arrest or to search Mortimer's home.  (*Id.* at ¶¶ 340-41).  From September 10, 2014, to September 17, 2014, White came to Mortimer's home five times looking for C.S. and was accompanied by "at least five [NYPD] squad cars for each visit."  (*Id.* at ¶¶ 342-43).  Plaintiffs also allege that Mortimer's home was illegally searched three times: *first*, on September 10, 2014, by two unnamed police officers, *second*, on September 14, 2014, by Defendant Officers Ancion and Stena and ACS Caseworker White, and *third*, on September 15, 2014, again by Ancion, Stena, and White.  (*Id.* at ¶¶ 345-57).  When White and two unnamed officers arrived

---

[8]  The TAC states that this occurred in September to December 2017, but because the TAC was filed in May 2017 and based on other allegations in the TAC, the Court infers that it should say 2014.

[9]  The warrant to which the TAC refers in fact directed law enforcement to arrest Mortimer and to "bring [C.S.] before the court."

at her home on September 16, 2014, Mortimer refused to let them search her home without a warrant. (*Id.* at ¶¶ 358-60).

Following these warrantless searches, Plaintiffs allege that Defendant ACS Investigative Consultant Keith Haymes "contacted NYPD asking NYPD to arrest [ ] Mortimer," but that the "NYPD refused twice as there had been no warrant or probable cause for [ ] Mortimer's arrest." (TAC ¶¶ 361-62). On September 16, 2014, "the City, the ACS … Defendants, Children's Village and [ ] White learned from the Department of Homeland Security that [C.S.] flew to Germany from the United States on August 30, 2014." (*Id.* at ¶ 363). The next day, Defendant Officers Arriaga, Ancion, and Lopez, together with ACS Caseworker White, went to Mortimer's home, and White directed the officers "to arrest [ ] Mortimer pursuant to the [C.S.] warrant." (*Id.* at ¶¶ 364-65).

## B.    **Procedural Background**

Plaintiffs initiated this action on September 11, 2015, and, since then, have thrice amended their pleadings. (Dkt. #1, 29, 53, 93). The Third Amended Complaint, the operative pleading, was filed on May 1, 2017. (Dkt. #93). ADA Duda, the ACS Defendants, and the Children's Village Defendants filed motions to dismiss on June 1, 2017. (Dkt. #101-07). On June 16, 2017, certain of the NYPD Defendants filed a motion for judgment on the pleadings or, in the alternative, for summary judgment. (Dkt. #111-14). Plaintiffs filed an opposition brief on August 9, 2017. (Dkt. #127). On September 8, 2017, counsel for the NYPD Defendants filed a reply brief and a letter stating that the remaining NYPD Defendants had been served with the TAC and asking that

they be permitted to join the motion.  (Dkt. #132, 134).  The Court granted that application on September 11, 2017.  (Dkt. #135).  ADA Duda also filed his reply brief on September 8, 2017.  (Dkt. #133).  The Children's Village Defendants and the ACS Defendants filed their reply briefs on October 6, 2017, and October 10, 2017, respectively.  (Dkt. #138, 140).

## DISCUSSION

### A.   Applicable Law

#### 1.   Motions to Dismiss Under Rule 12(b)(1)

The Children's Village Defendants move to dismiss Plaintiffs' claims against Dr. Waite pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction.  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova* v. *United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In this case, the Court must consider both its original and its supplemental jurisdiction to hear Plaintiffs' claims.  Under 28 U.S.C. § 1367, a district court "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy[.]"  28 U.S.C. § 1367(a); *see United Mine Workers of Am.* v. *Gibbs*, 383 U.S. 715, 725 (1966).  A court may decline to exercise jurisdiction where "the claim raises a novel or complex issue of State law," "the [state] claim substantially predominates over the … claims over which the district court has

original jurisdiction," or "the district court has dismissed all claims over which it has original jurisdiction[.]"  28 U.S.C. § 1367(c).

2. **Motions to Dismiss Under Rule 12(b)(6), and Motions for Judgment on the Pleadings Under Rule 12(c)**

ADA Duda, the ACS Defendants, and the Children's Village Defendants move to dismiss the TAC under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  To satisfy Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  In reviewing a motion to dismiss, a court must "draw all reasonable inferences in [the] [p]laintiffs' favor, 'assume all well-pleaded factual allegations' to be true, and 'determine whether they plausibly give rise to an entitlement to relief.'" *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  A court is not, however, obligated to credit "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks and citation omitted).  Ultimately, while Rule 8 "does not require detailed factual allegations, … it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted); *see generally* Fed. R. Civ. P. 8 (requiring, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief").

The NYPD Defendants move for a judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. Courts use the same standard to evaluate a motion for a judgment on the pleadings under Rule 12(c) as for a motion to dismiss under Rule 12(b)(6), except that the universe of documents a court may consider is expanded to include the pleadings of both the moving and non-moving parties. *Altman* v. *J.C. Christensen & Assocs., Inc.*, 786 F.3d 191, 193 (2d Cir. 2015); *L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011). Here, this makes little difference, as the only document appended to the NYPD Defendants' Amended Answer is an excerpt from the TAC. (Dkt. #100). [10]

*Pro se* litigants are afforded a special solicitude, one that requires "liberal construction of pleadings [and] motion papers" to avoid the "forfeit[ure] of important rights through inadvertence" occasioned by their inexperience and lack of formal legal training. *Tracy* v. *Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). Pleadings and submissions drafted by *pro se* litigants must be read "to raise the strongest arguments they suggest." *McLeod* v. *Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017). Here, Plaintiffs have filed a

---

[10] The NYPD Defendants request in the alternative that the Court grant their motion for summary judgment on the grounds that no genuine dispute of material fact exists. But Plaintiffs' opposition expressly requests "a full opportunity to respond to such a motion" and enumerates several categories of documents Plaintiffs require to amplify their claims, such as affidavits from Defendants, ACS case files, Children's Village case notes and medical records, Family Court records, and incarceration records. (Pl. Opp. 1-2). Rule 56(d) counsels that where a non-movant shows that "it cannot present facts essential to justify its opposition, the court may: [i] defer considering the motion or deny it; [or] [ii] allow time … to take discovery[.]" In light of Plaintiffs' requests, the Court denies the NYPD Defendants' motion for summary judgment without prejudice to renewal at a later date.

memorandum of law in opposition to the instant motions that includes several corrections to certain misstatements that Plaintiffs claim are in the ACS Defendants' moving brief. (Pl. Opp. 2-8). The facts set forth in Plaintiffs' opposition are largely redundant of those contained in the TAC. (*See id.*). Plaintiffs correctly argue that the Second Circuit admonishes district courts not to dismiss claims where the *pro se* plaintiff's "complaint and opposition papers ... state[] a claim upon which relief could be granted." (Pl. Opp. 1 (citing *Nielsen* v. *Rabin*, 746 F.3d 58, 63 (2d Cir. 2014))).

Defendants encourage the Court to ignore the facts raised in Plaintiffs' opposition, citing cases that hold that a court may not consider facts raised for the first time in a legal brief opposing a motion to dismiss. But the cited cases derive their holdings from Second Circuit cases in which all parties were represented by counsel — and thus were entitled to no solicitude — or which pre-date more recent Second Circuit case law holding that district courts may consider facts raised in an opposition brief and, indeed, may err in ignoring facts raised in *pro se* submissions. *Compare Payne* v. *Malemathew*, No. 09 Civ. 1634 (CS), 2011 WL 3043920, at *2 n.3 (S.D.N.Y. July 22, 2011) (citing *Friedl* v. *City of N.Y.*, 210 F.3d 79, 83-84 (2d Cir. 2000) (parties represented by counsel)), *with Walker* v. *Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion."), *and Nielsen*, 746 F.3d at 62 (reversing dismissal where plaintiff's complaint and opposition brief, taken together, stated a plausible claim to relief). Moreover, *Mira* v. *Argus*

*Media*, cited by the Children's Village Defendants, is inapposite insofar as it found that a district court was not required to consider entirely new claims raised for the first time in opposition to a motion to dismiss; indeed, the court found that district courts could consider additional facts that elaborate on other facts alleged in the pleadings. No. 15 Civ. 9990 (RJS), 2017 WL 1184302, at *3 & n.4 (S.D.N.Y. Mar. 29, 2017); *see also Shah* v. *Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007) (summary order) (citing *Wright* v. *Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (parties represented by counsel)).

### 3.    Documents the Court May Consider

The NYPD Defendants and ADA Duda attach documents to their motions for the Court's consideration. While the NYPD Defendants provide these documents as part of their motion for summary judgment, the Court will not hear the NYPD Defendants' motion for summary judgment at this juncture and denies it without prejudice. *See supra* at note 9. That issue resolved, the Court must then determine whether it can consider these documents in the context of a motion to dismiss under Rule 12(b)(6) or for judgment on the pleadings under Rule 12(c).

The NYPD Defendants put before the Court: (i) Mortimer's supporting deposition to the April 12, 2014 Domestic Incident Report; (ii) a video and a transcript of C.S.'s April 12, 2014 interview with ADA Duda; and (iii) a Family Court arrest warrant for Mortimer dated September 2, 2014. (Dkt. #112 (Declaration of Colin McCann Ceriello)). ADA Duda provides the Court with: (i)

the April 12, 2014 Domestic Incident Report; (ii) the video of C.S.'s interview; (iii) the criminal complaint against C.S. dated April 12, 2014; (iv) an order of protection dated April 12, 2014; and (v) a notice of claim Mortimer filed with the New York City Comptroller on February 4, 2015. (Dkt. #104 (Declaration of Elizabeth N. Krasnow)).

The NYPD Defendants and ADA Duda argue that these records are incorporated in the TAC by reference and, further, are integral to it. (NYPD Br. 7; Duda Br. 2-3). The Court agrees only as to the arrest warrant. The TAC adverts to Mortimer's supporting deposition and to the fact that C.S.'s interview was videotaped, but the gravamen of Plaintiffs' claims lies in the events described, and not the documentation memorializing those events. Under the NYPD Defendants' and ADA Duda's theory, a broad array of documents would become "integral" to a pleading simply by memorializing the events described therein, which is not the standard employed by the Second Circuit. The cases these Defendants cite — including one by this Court — pre-date the Second Circuit's decision in *Goel* v. *Bunge*, 820 F.3d 554, 558-59 (2d Cir. 2016). (*See* NYPD Br. 7 (citing *Betts* v. *Shearman*, No. 12 Civ. 3195 (JPO), 2013 WL 311124, at *3 (S.D.N.Y. Jan. 24, 2013)); Duda Br. 2-3 (citing *Johnson* v. *City of N.Y.*, No. 12 Civ. 4431 (KPF), 2013 WL 6171937, at *4-5 (S.D.N.Y. Nov. 25, 2013) (converting defendants' motion to one for summary judgment))).

*Goel* makes plain that references to a document in a pleading do not render the document integral to that pleading, thus the Court will not consider the Domestic Incident Report, the video of C.S.'s interview, or Plaintiff's notice

of claim.  *See Goel*, 820 F.3d at 559 ("Merely mentioning a document in the complaint will not satisfy this standard; indeed even offering limited quotations from the document is not enough.").  On the other hand, the TAC relies heavily on the terms and effect of the arrest warrant, and it is thus integral to Plaintiffs' claims.  Moreover, the criminal complaint and order of protection are documents of which the Court may take judicial notice, and it will consider them for the mere fact that they exist but not for the truth of the matters asserted therein.  *Roth* v. *Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *see also Jordan* v. *City of N.Y.*, No. 15 Civ. 6364 (CM), 2017 WL 3106453, at *2 (S.D.N.Y. July 17, 2017) ("Judicial notice may be taken of public records, including arrest reports criminal complaints, indictments, and criminal disposition data.").

### 4.    Claims Under 42 U.S.C. § 1983

"[Section 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere."  *City of Okla. City* v. *Tuttle*, 471 U.S. 808, 816 (1985).  To state any claim under § 1983, a plaintiff must allege two elements: "[i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges."  *Annis* v. *Cty. of Westchester*, 136 F.3d 239, 245 2d Cir. 1998).

### B.    Analysis

Plaintiffs raise the following claims under 42 U.S.C. § 1983: (i) violations of substantive due process rights; (ii) violations of procedural due process

rights; (iii) unreasonable searches and seizures in violation of the Fourth Amendment; (iv) malicious prosecution; (v) fabrication of evidence and denial of the right to a fair trial; (vi) malicious abuse of process; (vii) First Amendment retaliation; (viii) failure to intervene; and (ix) municipal liability under *Monell* v. *Department of Social Services*, 436 U.S. 658 (1978).[11]  Plaintiffs also raise several state-law torts: (i) negligent placement of C.S. in a foster home; (ii) negligent supervision of care after placement in a foster home; (iii) false arrest; (iv) false imprisonment; (v) negligent infliction of emotional distress; (vi) intentional infliction of emotional distress; (vii) trespass to land; (viii) trespass to chattel; (ix) slander; and (x) libel.  The Court addresses each of these claims after addressing several predicate issues raised by Defendants.

### 1. The Court Will Exercise Supplemental Jurisdiction over Plaintiffs' State-Law Claims Against Dr. Waite

Plaintiffs allege that Dr. Waite, an employee of Children's Village, vaccinated C.S. eight times and prescribed C.S. medications without Mortimer's consent and against her clearly-stated wishes.  (TAC ¶¶ 312-15).  Plaintiffs do not raise any federal claims against Dr. Waite; their only claims against him are state-law claims for negligent infliction of emotional distress and intentional infliction of emotional distress.  (*Id.* at ¶¶ 477-85).  The Children's Village Defendants urge the Court to decline to exercise supplemental jurisdiction over the claims against Dr. Waite, arguing that they

---

[11]  Plaintiffs also allege a standalone claim for "42 U.S.C. § 1983."  Because § 1983 does not confer any rights of its own, the Court understands this catchall claim simply to reiterate the jurisdictional basis for Plaintiffs' alleged constitutional violations.

"do not derive from the same 'common nucleus of operative fact' as the remainder of [P]laintiffs' claims[.]" (CV Br. 24-25).

The Court appreciates that Plaintiffs' claims against Dr. Waite are somewhat attenuated from Plaintiffs' grievances against ACS and the NYPD, but it does not believe them to be so far removed to render the exercise of supplemental jurisdiction improper. Plaintiffs' TAC is, broadly speaking, an attack on the methods by which several arms of the City government and Children's Village intervened in Plaintiffs' lives. Plaintiffs' claims against Dr. Waite are but one piece of that puzzle and their complaint against him fits comfortably within the same nucleus of operative facts.

Where state and federal claims form part of the same controversy, as they do here, the Second Circuit has found that supplemental jurisdiction is properly exercised over the state-law claims. *Shahriar* v. *Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245-46 (2d Cir. 2011). While this case is still at the pleadings stage, Plaintiffs filed it nearly two years ago and the Court has overseen Plaintiffs' numerous attempts to state legally sufficient claims. To force Plaintiffs to re-file their claims against Dr. Waite in state court at this juncture would not promote the values of economy, convenience, fairness, and comity championed by *Gibbs*. 383 U.S. at 726. Accordingly, the Court will hear Plaintiffs' state-law claims against Dr. Waite.

### 2. The Court Will Consider Plaintiffs' State-Law Tort Claims Against ADA Duda

New York's General Municipal Law requires as a condition precedent to filing state-law tort claims against a public corporation or any of its employees

that a notice of claim be filed with the New York City Comptroller "within ninety days after the claim arises." N.Y. Gen. Mun. Law § 50-e. The purpose of a notice of claim is to "enable authorities to investigate, collect evidence and evaluate the merit of a claim." *Brown* v. *City of N.Y.*, 95 N.Y.2d 389, 392 (2000).

The sufficiency of a notice of claim is a matter of some dispute in New York state courts. The Court of Appeals has held that notices of claim need not state matters "with literal nicety or exactness," but must give the municipality "information sufficient to enable the city to investigate," so that "municipal authorities can locate the place, fix the time and understand the nature of the accident." *Brown*, 95 N.Y.2d at 393. There is disagreement within the Appellate Division on whether individual municipal employees must be named in the notice of claim to be properly named as defendants in their official capacities in a later lawsuit.[12] The Second, Third, and Fourth Departments have held that they need not be named; the First Department has held that they do.

The Fourth Department, in *Goodwin* v. *Pretorius*, held that § 50-e did not require as a condition precedent to suit against individual municipal employees that they be named in a notice of claim. 962 N.Y.S.2d 539, 545-46 (4th Dep't 2013). In so holding, the Fourth Department overturned its earlier precedents, which had "by judicial fiat" read into the statute a requirement that individual

---

[12] There is no notice of claim requirement if a municipal employee is named in his or her individual capacity. *Alvarez* v. *City of N.Y.*, 22 N.Y.S.3d 362, 365 (1st Dep't 2015).

employees be named. *Id.* at 545. The *Goodwin* court was guided in substantial measure by the Court of Appeals' instruction in *Brown* that the overarching purpose of a notice of claim is to give a municipality sufficient information to investigate the claims a plaintiff intends to raise. *Id.* at 546. The Third Department then similarly held that § 50-e does not "require that an individual municipal employee be named in the notice of claim" because the purpose of a notice of claim "may be served without requiring a plaintiff to name the individual agents, officers or employees in the notice of claim." *Pierce* v. *Hickey*, 11 N.Y.S.3d 321, 323 (3d Dep't 2015).

A few months later, a plurality of the First Department reached the opposite conclusion and affirmed the dismissal of claims against two assistant district attorneys who had not been named in the plaintiff's notice of claim. *Alvarez* v. *City of N.Y.*, 22 N.Y.S.3d 362, 367 (1st Dep't 2015). The First Department distinguished *Goodwin* and *Pierce* and stood on its own precedents that had held that individuals need to be named, even if just as John Does, to put a city on notice that its individual employees may be sued. *Id.* at 366. Two justices of the First Department dissented, reasoning that the plain text and underlying purpose of § 50-e did not require that individual employees be named. *Id.* at 367-70 (Manzanet-Daniels, *J.*, dissenting). Subsequently, the Second Department joined the Third and Fourth in holding that individual employees do not need to be named in a notice of claim. *Blake* v. *City of N.Y.*, 51 N.Y.S.3d 540, 544-45 (2d Dep't 2017).

Plaintiffs state in the TAC that Mortimer filed a notice of claim with the Comptroller on February 4, 2015, "against NYC ACS, the Department of Social Services Human Resources Administration, the NYC Police Department and the NYS Department of Children Services" alleging "violations of civil and constitutional rights, gross negligence and defamation, malicious prosecution, harassment and forced coercion, illegal search and seizure, obstruction of justice, and unlawful arrest." (TAC ¶ 412).[13] Plaintiffs do not allege that ADA Duda was named, and ADA Duda seizes on this to argue that the state-law claims against him in his official capacity must be dismissed. (Duda Br. 15-16). In light of the plain text of § 50-e and the Court of Appeals' dicta in *Brown* that the statute does not demand complete precision, the Court believes the Second, Third, and Fourth Departments have the better of the argument. It thus denies ADA Duda's motion to dismiss Plaintiffs' state-law claims against him in his official capacity based on a failure to name him in the notice of claim, and will consider the merits of those claims below.

### 3. The Court Finds the Children's Village Defendants to Be State Actors

An essential element of a § 1983 claim is that the defendant act under color of state law. This requirement has been interpreted as an extension of the "state action" requirement for liability to attach under the Fourteenth Amendment, and thus conduct that satisfies such state action analysis will

---

[13]     ADA Duda attaches a copy of Plaintiffs' notice of claim with his brief but the Court will not consider it. Despite reciting the claims contained in the notice, the TAC does not rely heavily on its terms or effects. *Goel* v. *Bunge*, 820 F.3d 554, 558-59 (2d Cir. 2016).

suffice here.  *See Brentwood Acad.* v. *Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 n.2 (2001).  The Second Circuit has held that "a private actor acts under color of state law when the private actor 'is a willful participant in joint activity with the State or its agents.'"  *Ciambrello* v. *Cty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (quoting *Adickes* v. *S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)).  State action is often found in one of three settings:

> [i] when the entity acts pursuant to the coercive power of the state or is controlled by the state ("the compulsion test"); [ii] when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ("the joint action test" or "close nexus test"); or [iii] when the entity has been delegated a public function by the state ("the public function test").

*Fabrikant* v. *French*, 691 F.3d 193, 207 (2d Cir. 2012) (internal brackets and citation omitted).

The Children's Village Defendants argue that the TAC fails to allege facts sufficient to show that they acted under color of state law.  (CV Br. 3-5).  The TAC alleges that C.S. was removed from Mortimer's custody pursuant to a Family Court order; that C.S. was initially placed at Children's Village, where he received medical and mental health care; that Children's Village subsequently placed C.S. with a foster family; and, later, that Children's Village Caseworker White harassed Mortimer, searched her home, and caused her to be arrested.  (TAC ¶¶ 288-365).  The Children's Village Defendants argue that these facts do not demonstrate state action because Dr. Waite and White were merely employees of a private entity, and that White "had no authority of any

kind to obtain a warrant, issue a subpoena, or arrest, detain or incarcerate anyone."  (CV Br. 4-5).

Plaintiffs direct the Court to controlling Second Circuit precedent: *Perez* v. *Sugarman*, 499 F.2d 761 (2d Cir. 1974).  (Pl. Opp. 8).  *Perez* held that a private foster care agency was a state actor for purposes of § 1983 because the New York statutory scheme provided that the state could employ private organizations to assist in giving care to neglected or abused children.  *Perez*, 499 F.2d at 764-65.  As it happens, courts in this Circuit have begun to question whether *Perez* remains good law in light of more recent Supreme Court decisions emphasizing the exclusivity element of the public function test. *See, e.g.*, *Castro* v. *Windham*, No. 16 Civ. 8148 (LTS) (KHP), 2017 WL 4676644, at *3 (S.D.N.Y. Sept. 19, 2017) (citing *Rendell-Baker* v. *Kohn*, 457 U.S. 830, 837 (1982), *report and recommendation adopted*, 2017 WL 46757756 (S.D.N.Y. Oct. 16, 2017)).  But even as courts have questioned *Perez*'s continued force, they have found that it remains good law unless and until the Second Circuit holds otherwise, and they have found private foster agencies to be state actors.  *Id.* at *4; *P.P.* v. *City of N.Y.*, No. 13 Civ. 5049 (CM), 2014 WL 4704800, at *14-15 (S.D.N.Y. Sept. 19, 2014) (holding that *Perez* remained good law but was undermined by "subsequent doctrinal developments"); *S.W. ex rel. Marquis-Abrams* v. *City of N.Y.*, 46 F. Supp. 3d 176, 195-96 (E.D.N.Y. 2014) (same, without adopting other courts' "misgivings" about *Perez*); *Phelan ex rel. Phelan* v. *Torres*, 843 F. Supp. 2d 259, 268-74 (E.D.N.Y. 2011) (citing ample authority undermining *Perez*'s holding), *aff'd sub nom. Phelan ex rel. Phelan* v. *Mullane*,

512 F. App'x 88, 90 (2d Cir. 2013) (summary order) ("Assuming without deciding that [foster care agency] qualifies as a state actor subject to suit under § 1983[.]").

The Court joins the others in this Circuit to consider the issue. While the Court echoes their concerns about the continued vitality of *Perez*, it is likewise unable to depart from that precedent and thus holds that the Children's Village Defendants are state actors subject to liability under § 1983.

### 4. The Court Dismisses Plaintiffs' § 1983 Claims Against ACS Defendants Barnes, Osborne, Castan, and Browne, and NYPD Officer Shelley for Lack of Personal Involvement

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Colon* v. *Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (quoting *Wright* v. *Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). A corollary to this principle is that "the doctrine of respondeat superior does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity." *Rahman* v. *Fisher*, 607 F. Supp. 2d 580, 584-85 (S.D.N.Y. 2009) (quoting *Hayut* v. *State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir. 2003) (internal quotation marks and ellipsis omitted)); *see also Richardson* v. *Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("Supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." (internal quotation marks and brackets omitted)).

To impose liability under § 1983 against an individual acting in a supervisory capacity, as ACS Caseworker Barnes and Supervisors Osborne,

Castan, and Browne are alleged to have been, "a plaintiff must show the defendant's personal involvement in the alleged constitutional violations." *Richardson*, 347 F.3d at 435. In this regard, supervisory liability under § 1983 can be shown by:

> [i] actual direct participation in the constitutional violation, [ii] failure to remedy a wrong after being informed through a report or appeal, [iii] creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, [iv] grossly negligent supervision of subordinates who committed a violation, or [v] failure to act on information indicating that unconstitutional acts were occurring.

*Id.* The Court agrees with the ACS Defendants that Plaintiffs have not made this showing as to Barnes, Osborne, Castan, and Browne. (ACS Br. 20-22). Plaintiffs allege that these Defendants were supervisors to ACS Caseworkers Salinas and Wilson, and fault them for approving certain actions and "fail[ing] to properly investigate the facts." (TAC ¶¶ 21, 117-18, 229-30, 287). But Plaintiffs' perfunctory allegations do not rise to the level of grossly negligent supervision or a failure to prevent or otherwise act on known constitutional violations. Accordingly, Defendant ACS Caseworker Barnes and ACS Supervisors Osborne, Castan, and Browne are not subject to liability for any of Plaintiffs' claims brought under § 1983, and the claims against them are dismissed.

By contrast, the Court does not agree with the ACS Defendants that Plaintiffs have failed to allege personal involvement by ACS Caseworker Booker and ACS Investigative Consultant Haymes. (ACS Br. 20-22). While Booker is

alleged to have had a supervisory role, Plaintiffs also claim that Booker had conversations with C.S. prior to a hearing in Family Court regarding his safety plan and, thereafter, initiated proceedings in Family Court to remove C.S. from Mortimer's custody.  (TAC ¶¶ 253-72).  Plaintiffs allege that Haymes personally contacted the NYPD to demand Mortimer's arrest.  (*Id.* at ¶ 361).  Putting aside for the moment the issue of whether these allegations state a plausible entitlement to relief, the Court finds that they do suffice to plead Booker's and Haymes's personal involvement.

Finally, the Court agrees with the NYPD Defendants that Plaintiffs fail to allege personal involvement by NYPD Officer Shelley.  (NYPD Br. 20).  Officer Shelley only appears twice in the TAC — once in the case caption and once in the list of parties to the action.  (TAC ¶ 16).  Because Plaintiffs make no factual allegations whatsoever as to Officer Shelley, Plaintiffs' claims under § 1983 against Officer Shelley are dismissed.[14]

### 5.    Plaintiffs Fail to State a Claim for Violation of Mortimer's Substantive Due Process Rights

The Second Circuit has "long recognized that parents have a 'constitutionally protected liberty interest in the care, custody and management of their children[.]'"  *Southerland* v. *City of N.Y.*, 680 F.3d 127, 152 (2d Cir. 2012) (quoting *Tenenbaum* v. *Williams*, 193 F.3d 581, 596-97 (2d Cir. 1999)); *see also Santosky* v. *Kramer*, 455 U.S. 745, 753-54 (1982).  This right is cognizable under a substantive due process theory.  *Southerland*, 680 F.3d at

---

[14]     By the same token, all of Plaintiffs' state-law claims against Officer Shelley are also dismissed for a failure to meet Rule 8's baseline pleading requirements.

152.  *Southerland* provides a helpful roadmap to the various constitutional violations that could be occasioned by the removal of children from their parents' homes, and the Court draws on its guidance in this section and the two that follow.

To show that the removal of children from the home amounts to a substantive due process violation, "a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Southerland*, 680 F.3d at 151 (quoting *Okin* v. *Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009)).  "[I]n the child-removal context, we ask whether 'the removal would have been prohibited by the Constitution even had the plaintiffs been given all the procedural protections to which they were entitled.'"  *Id.* (alterations omitted) (quoting *Tenenbaum*, 193 F.3d at 600).  A parent's interest in the unity of their family must at times give way to the government's "compelling interest" in safeguarding children from abuse or neglect at the hands of their parents. *Wilkinson ex rel. Wilkinson* v. *Russell*, 182 F.3d 89, 104 (2d Cir. 1999); *Brown* v. *Town of E. Haddam*, 213 F.3d 625 (Table), 2000 WL 536156, at *2 (2d Cir. 2000) (summary order) ("The right to family integrity does not include a constitutional right to be free from child abuse investigations." (citing *Watterson* v. *Page*, 987 F.2d 1, 8 (1st Cir. 1993))).

The ACS Defendants correctly argue that an ACS caseworker does not effect a violation of a parent's constitutionally protected interest where the caseworker "has a reasonable basis for thinking that the child is abused or

neglected." *Southerland*, 680 F.3d at 152. (*See* ACS Br. 9-13). Underpinning the reasonable basis standard is the "need for unusual deference" to those who investigate allegations of child abuse or neglect. *Id.* The state's interference must be severe; a temporary removal for several days does not effect a substantive due process violation where the purpose is to keep the child safe. *Id.* at 152-53. Of critical significance here, "once [a] court confirmation of the basis for removal is obtained, any liability for the continuation of the allegedly wrongful separation of parent and child can no longer be attributed to the officer who removed the child." *Id.* at 153 (internal quotation marks and citations omitted). Finally, while this claim is properly raised by Mortimer, it may not be raised by C.S., because a child's claim for improper removal from his parents' home is not cognizable as a substantive due process violation and must be pled as a procedural due process violation and/or an improper seizure under the Fourth Amendment. *Id.* at 142-43.

The TAC states that "Defendants' false statements and objectively unreasonable actions violated Plaintiffs' clearly established family-togetherness rights." (TAC ¶ 419). The Court understands Mortimer to attack two actions by state actors that impinged on Plaintiffs' right to cohabitate as a family: (i) the decision by ADA Duda to pursue an order of protection that caused Plaintiffs' separation, and (ii) the decision by the ACS Defendants to seek an

order from the Family Court removing C.S. from Mortimer's custody. (*See* TAC ¶¶ 191-95, 246-86).[15] The Court looks at each of these actions in turn.

Mortimer's substantive due process claim against ADA Duda for causing her separation from C.S. fails. ADA Duda handled C.S.'s prosecution for "[seven] counts of multiple offenses," including assault (TAC ¶ 137), and, in so doing, learned information suggesting that an order of protection was warranted. The criminal complaint against C.S. — a court record of which judicial notice may be taken — contains an affidavit from Defendant Officer Hurst stating that Mortimer claimed "she observed the defendant use his hands to shove her and grab her," "that during the struggle a door was slammed shut on her hand causing a deep lacer[a]tion to her left index finger which required stitches as well as [caused] substantial pain," and that C.S. told her "'I will hurt you if you don[']t get out of my way,' thereby placing her in fear for her physical safety." (Dkt. #104-3). It matters not whether these statements were true; because ADA Duda had been presented with these allegations by Mortimer against C.S., it can hardly be said that ADA Duda's

---

[15] To the extent Mortimer seeks any relief on a substantive due process theory for her separation from C.S. in late 2013 or early 2014, that claim fails. The TAC makes an oblique reference to C.S.'s residence outside Mortimer's home in this time period but does not explain when or why he left. (*See* TAC ¶¶ 52, 68, 76). Plaintiffs allege that C.S. returned to live in Mortimer's home "without any ACS intervention," (*Id.* at ¶ 76), and this seriously undercuts any inference that C.S. had been removed from the home by ACS. In their opposition brief, Plaintiffs claim that there was a pending ACS investigation during this time (which was initiated by a Family Court order) and that this Family Court case was "dismisse[d] ... on March 24, 2014." (Pl. Opp. 3-5). But the fact that there was an investigation ongoing does not suggest that there was necessarily an order in place demanding C.S.'s removal from the home. Because the TAC fails to allege that ACS was involved in C.S.'s absence from Mortimer's home in this time period, the Court cannot find that these facts give rise to any entitlement to relief.

decision to seek an order of protection effected a deprivation of Mortimer's interest in her family's integrity sufficient to shock the conscience.

And in any event, ADA Duda is entitled to qualified immunity even if acting outside his core prosecutorial role. *See Smith* v. *Garretto*, 147 F.3d 91, 94 (2d Cir. 1998). Because ADA Duda acted based on the allegations as presented to him by Officer Hurst, it was reasonable to obtain the order of protection and he is thus entitled to qualified immunity. *Walczyk* v. *Rio*, 496 F.3d 139, 154 (2d Cir. 2007) ("[I]f officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context," the officer is entitled to qualified immunity.).

Plaintiffs' claim likewise fails as to the ACS Defendants' decision to place C.S. into non-kinship foster care. C.S. left Mortimer's home on July 23, 2014, following their "quarrel" about C.S. being unable to use his computer until he finished his housework. (TAC ¶ 231). The NYPD responded to C.S.'s 911 call, and "Mortimer and [C.S.] agreed that [C.S.] would stay with [his] [g]randmother for a time." (*Id.* at ¶¶ 233-36). Because C.S.'s July 23, 2014 departure from the home was agreed-to by Plaintiffs, Mortimer cannot state a claim on these facts. About one week later, on August 1, 2014, the Family Court held a hearing regarding C.S. and issued an order placing C.S. in non-kinship foster care. (*Id.* at ¶ 292).[16] After this time, the separation of Mortimer from her child

---

[16]     The Court does not understand Plaintiffs to attack the validity of the Family Court order itself, but if they do, the Court is barred by the *Rooker-Feldman* doctrine from hearing such a claim, and thus will not opine on the propriety of that ruling. *See generally Phifer* v. *City of N.Y.*, 289 F.3d 49, 55 (2d Cir. 2002) ("The *Rooker-Feldman* doctrine holds that inferior federal courts lack subject matter jurisdiction 'over cases that

is "no longer attribut[able] to the officer who removed the child." *Southerland*, 680 F.3d at 153. Because C.S.'s residence outside Mortimer's home from July 23, 2014, to August 1, 2014, was voluntary, and because his continued separation from her from August 1, 2014, until his departure for Germany was pursuant to a court order, Mortimer fails to state a claim against any of the Defendants for a violation of her substantive due process rights, and Plaintiffs' second cause of action is dismissed.

### 6. Plaintiffs State a Claim for Violation of Mortimer's Procedural Due Process Rights[17]

In the Second Circuit, "before parents may be deprived of the care, custody, or management of their children without their consent, due process — ordinarily a court proceeding resulting in an order permitting removal — must be accorded to them." *Southerland*, 680 F.3d at 149 (internal quotation marks and citation omitted). However, children may be removed without a court order or parental consent in emergency circumstances where there is objectively reasonable evidence that the "children will be left bereft of care and supervision" and that the risk of harm to the children is imminent. *Id.* (internal quotation marks and citation omitted); *Duchesne* v. *Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977).

To reiterate, Mortimer cannot state a claim for relief based on C.S.'s consensual departure from the home on July 23, 2014. By the same token,

---

effectively seek review of judgments of state courts and that federal review, if any, can occur only by way of a certiorari petition to the Supreme Court.'" (citation omitted)).

[17]    The Court does not construe the TAC as raising a procedural due process claim on behalf of C.S. (*See* TAC ¶¶ 422-25).

the Court cannot find that exigent circumstances justified ACS's August 1, 2014 removal request in Family Court, inasmuch as C.S. was already living outside Mortimer's home at that time. Accordingly, ACS needed to obtain a court order for C.S.'s removal, which it did. *See Tenenbaum*, 193 F.3d at 594 ("If the danger to the child is not ... imminent ... there is no reason to excuse the absence of the judiciary's participation in depriving the parents of the care, custody, and management of their child."). The TAC alleges that the ACS Defendants "initiated Family Court proceedings to remove [C.S.] from [ ] Mortimer's custody to ACS's custody for placement in non-kinship foster care" on August 1, 2014, and that a hearing was held the same day the petition was filed — August 1, 2014. (TAC ¶¶ 246, 249).

Mortimer is clear in her allegation that she did not have notice of the August 1, 2014 Family Court conference. (TAC ¶¶ 248-52). In this regard, she alleges that ACS Caseworker Wilson "recorded in her notes that on or about July 31, 2014, [ ] Wilson went to the Mortimer [h]ome and stuck a notice on the letterbox about a family conference and hearing to be held the next day," but that these "notes were false." (*Id.* at ¶¶ 249-51). Under New York's Family Court Act, Mortimer was statutorily entitled to notice of the proceedings: § 1027 of the Act, by reference to § 1023, requires that ACS "make every reasonable effort, with due regard for any necessity for immediate protective action, to inform the parent ... of the intent to apply for the order," including "the date and the time that the application will be made." N.Y. Fam. Ct. Act §§ 1023, 1027(a)(iv). The question that remains is whether Mortimer was

*constitutionally* entitled to notice of the August 1, 2014 Family Court proceedings.[18]

The ACS Defendants do not argue that C.S.'s removal was occasioned by exigent circumstances, nor do they try to rebut Plaintiffs' well-pleaded allegation that Mortimer did not receive the notice to which she was statutorily entitled. (ACS Br. 16). Rather, the ACS Defendants argue that, putting aside whether ACS made reasonable efforts to notify Mortimer of the August 1, 2014 hearing, notice is not constitutionally required for proceedings under § 1027 of the Family Court Act, and thus no violation of procedural due process was occasioned by any failure to give Mortimer notice of the hearing. (*Id.*).[19] The ACS Defendants further argue that Caseworker Wilson is entitled to qualified immunity based on the reasonableness of her actions. (ACS Br. 16).

An officer is entitled to qualified immunity if "[i] his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or [ii] it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Jenkins* v. *City of N.Y.*, 478 F.3d 76, 87 (2d Cir. 2007) (internal quotation

---

[18]    Mortimer alleges that she "found a summons on the floor in her building" regarding the August 11, 2014 Family Court proceeding, and that she attended that hearing. (TAC ¶¶ 293, 295-96). Because Mortimer alleges she received notice and was present at the August 11, 2014 hearing, she may not state a claim for a due process violation in connection with that proceeding.

[19]    The ACS Defendants also point the Court to § 1036 of the Family Court Act, which provides that if the parent is not present for the removal of the child, "it is not until after the initial court hearing on the removal of the children that the petition and summons are issued." (ACS Br. 16). This reference misses the point: The question presented by Plaintiffs' claim is not what notice was required because she was absent from the § 1027 hearing, but rather what notice was required for the § 1027 hearing itself.

marks and citation omitted).  The Court is mindful that "assertions of qualified immunity should be addressed as early as possible in the judicial process," *Savino* v. *City of N.Y.*, 331 F.3d 63, 71 (2d Cir. 2003), and that a court may address the two prongs of a qualified immunity analysis in either order, and need not consider both if it determines that one or the other is not satisfied, *Raspardo* v. *Carlone*, 770 F.3d 97, 113 (2d Cir. 2014) (citing *Pearson* v. *Callahan*, 555 U.S. 223, 236 (2009)).

The Court believes it the more prudent course to look first at whether this right was clearly established at the time of the alleged violation in 2014. The Second Circuit has refrained from expressly holding that parents are entitled notice of preliminary abuse or neglect proceedings where exigent circumstances are not present.  *Southerland*, 680 F.3d at 149 ("If the danger to the child is not … imminent," ACS must obtain a court order, "*ex parte* or otherwise."); *Tenenbaum*, 193 F.3d at 594 n.10 ("We thus do not hold, expressly or implicitly … that notice to parent or guardian is constitutionally required.").  And several district courts have expressed doubt that procedural due process demands notice of a temporary removal hearing under § 1027. *Callahan* v. *City of N.Y.*, 90 F. Supp. 3d 60, 73-74 (E.D.N.Y. 2015); *Green ex rel. T.C.* v. *Mattingly*, No. 07 Civ. 1790 (ENV), 2010 WL 3824119, at *9 (E.D.N.Y. Sept. 23, 2010); *Villanueva* v. *City of N.Y.*, No. 08 Civ. 8793 (LBS), 2010 WL 1654162, at *8 (S.D.N.Y. April 14, 2010).  Nevertheless, it is settled law in the Second Circuit and beyond that parents have a protected interest in the custody of their children, *Southerland*, 680 F.3d at 152, and that "[t]he

43

fundamental requirement of due process is the opportunity to be heard at a meaningful time and in an meaningful manner," *Mathews* v. *Eldridge*, 424 U.S. 319, 332 (1976) (internal quotation marks and citation omitted).

Typically, due process is satisfied when "an individual [is] given an opportunity for a hearing *before* he is deprived of a significant property interest." *Cleveland Bd. of Educ.* v. *Loudermill*, 470 U.S. 532, 542 (1985). And even though the Second Circuit has not held that notice of a pre-deprivation hearing is required before children are removed from a parent's home absent exigent circumstances, the First, Fourth, Sixth, Eighth, Ninth, and Tenth Circuits have. *See Kovacic* v. *Cuyahoga Cty. Dep't of Children & Family Servs.*, 724 F.3d 687, 695 (6th Cir. 2013) ("[E]xigent circumstances may alter the notice and hearing requirements typically required under the Fourteenth Amendment in child-removal cases." (citing *Doe* v. *Staples*, 706 F.2d 985, 990 (6th Cir. 1983), for the proposition that due process requires that "the parents be given notice prior to the removal of the child (at the time of the removal when exigent circumstances exist or promptly thereafter) stating the reasons for the removal")); *Heartland Acad. Cmty. Church* v. *Waddle*, 427 F.3d 525, 534-35 (8th Cir. 2005) (affirming ruling below that juvenile officer violated boarding school's procedural due process right when he removed children without prior notice and hearing and in the absence of exigent circumstances); *Tower* v. *Leslie-Brown*, 326 F.3d 290, 298-99 (1st Cir. 2003) ("Ordinarily, a deprivation of a fundamental right such as the custody of one's children must be preceded by notice and an opportunity to be heard[,]" but this requirement

is postponed "where the safety of the child is at risk."); *Batten* v. *Gomez*, 324 F.3d 288, 295 (4th Cir. 2003) ("Generally, absent exigent circumstances, due process requires a hearing before state officials may remove a child from her home."); *see also id.* ("[Defendants] concede that there was no pre-enforcement notice and no opportunity to object[.] … Under these circumstances, we are satisfied that [Plaintiff] has stated a claim for a deprivation, without due process, of her liberty interest … without prior notice to her … and without exigent circumstances."); *Ram* v. *Rubin*, 118 F.3d 1306, 1311 (9th Cir. 1997) ("[N]ormally, notice and a hearing are required before the children can be removed, even temporarily, from the custody of their parents."); *Hollingsworth* v. *Hill*, 110 F.3d 733, 739 (10th Cir. 1997) ("Removal of children from the custody of their parents requires predeprivation notice and a hearing except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event."); *cf. Gates* v. *Tx. Dep't of Protective & Regulatory Servs.*, 537 F. 3d 404, 435 (5th Cir. 2008) (upholding post-deprivation hearing as sufficient due process where removal of children was justified by exigent circumstances). *But see Dennis* v. *Dejong*, 557 F. App'x 112 (3d Cir. 2014) (unpublished opinion) ("[W]e have held, 'initiating child custody proceedings by *ex parte* orders is generally constitutional if a prompt post-deprivation hearing is held.'" (brackets and citation omitted)).

The Seventh Circuit has expressly held that a hearing is required and its precedents indicate that notice of the hearing must be provided. *Morrell* v. *Mock*, 270 F.3d 1090, 1095 (7th Cir. 2001) (discussing whether exigent

circumstances justified removing a child without notice and a hearing); *Brokaw* v. *Mercer Cty.*, 235 F.3d 1000, 1020 (7th Cir. 2000) ("Minimally, [due process] also means that government officials will not remove a child from his home without an investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances.").

The Second Circuit's own precedents make clear that a court order is required to remove a child from his or her parent's home without exigent circumstances. *Southerland*, 680 F.3d at 149. To muddy the waters, *Southerland* adds that a court order may be obtained "*ex parte* or otherwise" — a phrase borrowed from the Circuit's earlier decision in *Tenenbaum*. *Id.* The Court does not believe that this phrase — taken from cases where, in fact, there were exigent circumstances warranting immediate removal of the child — merits a finding that a parent's right to notice of a removal hearing, absent exigent circumstances, was not clearly established in 2014. Importantly, a court determines whether a right is clearly established by considering "[i] whether the right was defined with reasonable specificity; [ii] whether Supreme Court or court of appeals case law supports the existence of the right in question[;] and [iii] whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott* v. *Fisher*, 616 F.3d 100, 105 (2d Cir. 2010). Moreover,

> [e]ven if this or other circuit courts have not explicitly held a law or course of conduct to be unconstitutional, the unconstitutionality of that law or course of conduct will nonetheless be treated as clearly established if decisions by this or other circuits "clearly foreshadow a

particular ruling on the issue," even if those decisions come from courts in other circuits.

*Id.* (quoting *Varrone* v. *Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997)).

In *Southerland* and *Tenenbaum*, the Second Circuit was not presented with this exact issue, since both cases considered whether the removal was justified by exigent circumstances. *Southerland*, 680 F.3d at 149-51; *Tenenbaum*, 193 F.3d at 593-95. Thus, because the Second Circuit has not directly confronted this issue, and in light of the uniform decisions of six Courts of Appeals that have most directly addressed the issue, the Court holds that a parent's right to notice and a hearing before the removal of a child from the home absent exigent circumstances was clearly established by the time the ACS Defendants initiated neglect proceedings against Mortimer in 2014.

Here, the Court's analysis regarding whether this right was clearly established necessarily overlaps with its determination of whether it was violated. By virtue of its holding that, by 2014, a parent had a clearly established right to pre-removal notice and a hearing in the absence of exigent circumstances, the Court also holds that this right was violated if Mortimer did not, as she alleges, receive notice of the August 1, 2014 Family Court hearing. Because the Court finds that the right was both clearly established and, taking Plaintiffs' allegations to be true, violated, ACS Caseworker Wilson is not entitled to qualified immunity for her alleged failure to give Mortimer notice of the proceedings. This claim survives the ACS Defendants' motion to dismiss.

### 7. Plaintiffs' Search and Seizure Claims Fail

#### a. C.S.'s Removal from the Home Was Not an Unlawful Seizure

As noted above, C.S.'s claim for his allegedly improper separation from his mother must be raised as an unlawful seizure under the Fourth Amendment. Because a claim for illegal seizure of a child from the home arises under the Fourth Amendment, the Second Circuit evaluates the legality of this type of seizure much as it does one in the traditional law enforcement context — that is, a seizure made with consent or a warrant does not occasion a constitutional violation. *Southerland*, 680 F.3d 157-58. Where a child is removed from the home without the parents' consent or a court order, courts look to the traditional exceptions to the warrant requirement (e.g., exigency or special needs) to ascertain the legality of the seizure. *Id.* And though this Circuit has not settled on what standard should be the "constitutional floor in child-removal cases," that is of no matter here. *Id.* at 158. C.S. was removed from his home in July 2014 on his consent and in August 2014 pursuant to a court order. Neither removal amounted to a Fourth Amendment violation. As discussed above, the order of protection is likewise no basis for recovery here. In that context, as with the removals by ACS, C.S. was kept from Mortimer's home pursuant to a court order that, Plaintiffs do not dispute, was validly issued. It was thus not an unlawful seizure in contravention of the Fourth Amendment.[20]

---

[20] For the reasons stated above, even if the order of protection did effect a constitutional violation, ADA Duda is entitled to qualified immunity for his decision to seek an order of

### b. The Warrantless Searches of Plaintiffs' Home Did Not Violate the Fourth Amendment

Plaintiffs assert a Fourth Amendment violation in connection with ACS Caseworker White's and NYPD Officers Ancion's and Stena's allegedly unlawful searches of her emails, interception of her phone calls, and searches of her home in the time following C.S.'s flight to Germany. (TAC ¶¶ 325-60). The TAC states that after C.S. left New York, White harassed Mortimer by coming to her home eight times in September 2014; by intercepting her emails, phone calls, and postal mail; and by opening a FedEx package addressed to Mortimer. (*Id.* at ¶¶ 328-32). Plaintiffs' allegations in this regard are entirely conclusory — they offer no examples or further information that would explain how White, who is not a law enforcement agent, was able to intercept Mortimer's private communications (particularly the electronic ones). On these facts, Plaintiffs simply fail to "nudge[] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570.

More plausible, but legally insufficient nonetheless, are Plaintiffs' allegations that White, Ancion, and Stena violated Mortimer's right to be free from warrantless searches when they entered her home. Plaintiffs' allegations are thus: On September 2, 2014, the Family Court held a hearing, at which White and Mortimer were present, and "issued a 'pick-up' warrant for [C.S.'s] arrest." (TAC ¶¶ 337-38). On September 14, 2014, Mortimer encountered Ancion and Stena outside her apartment; they had an arrest warrant for C.S.

---

protection based on the information available to him at the time, including the information that was cited in the criminal complaint against C.S.

but no search warrant; White arrived shortly thereafter and all three entered Mortimer's home. (*Id.* at ¶¶ 348-53). On September 15, 2014, Ancion, Stena, and White returned to Mortimer's home, again without a search warrant, but stated they had "a different warrant from the [C.S.] warrant." (*Id.* at ¶¶ 354-57).[21]

Significantly, Plaintiffs acknowledge that a warrant had been issued for C.S.'s arrest. As the NYPD Defendants correctly argue, officers in possession of a valid arrest warrant may enter the target's home if they believe he will be found therein. The Supreme Court confirmed in *Payton* v. *New York*, that "the Fourth Amendment has drawn a firm line at the entrance to the house," but that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." 445 U.S. 573, 590, 603 (1980). Although C.S. had been removed from his home, the officers were entitled to enter if they had reason to believe he was there.

The facts as alleged support that reasonable belief: On August 30, 2014, C.S. ran away from his foster home, but his whereabouts were not ascertained until September 16, 2014, at which time the ACS Defendants and White "learned from the Department of Homeland Security that [C.S.] flew to

---

[21]    Plaintiffs allege that two unidentified officers of the NYPD effected a warrantless search of Mortimer's home on September 10, 2014, but because Plaintiffs do not identify the officers — after having ample opportunity to do so — the Court will not consider this claim. (*See* TAC ¶¶ 345-47). Plaintiffs also allege that White and two unnamed NYPD officers returned to her home on September 16, 2014, but that she refused to let them in. (*Id.* at ¶¶ 358-60). Accordingly, no Fourth Amendment violation follows from this incident.

Germany … on August 30, 2014." (TAC ¶¶ 325, 363). Without knowing where

C.S. was at the time, it was reasonable for the officers to believe that he may

have returned to his home and could be found there. On these facts, the

conduct of Ancion, Stena, and White does not give rise to a *Payton* violation as

to C.S. *See United States* v. *Lauter*, 57 F.3d 212, 214 (2d Cir. 1995) ("Agents

may enter a suspect's residence, or what they have reason to believe is his

residence, in order to effectuate an arrest warrant where a reasonable belief

exists that the suspect is present.").

Nor do these facts effect a *Steagald* violation as to Mortimer. *See*

*Steagald* v. *United States*, 451 U.S. 204 (1981) (holding that officers may not

search a third party's home armed solely with an arrest warrant for a

non-resident). A cohabitant of a home has a "reduced expectation of privacy"

and thus "the requirement that the person named in an arrest warrant 'open

his doors to the officers of the law' does not allow a house-mate to keep those

doors shut." *United States* v. *Lovelock*, 170 F.3d 339, 345 (2d Cir. 1999)

(quoting *Payton*, 445 U.S. at 603). Accordingly, Plaintiffs' fourth cause of

action for unreasonable search and seizure is dismissed.

### 8. Plaintiffs' Malicious Prosecution Claims Survive as to C.S. but Not as to Mortimer[22]

Plaintiffs bring three claims for malicious prosecution: one as to C.S.'s

April 2014 criminal prosecution, a second as to Mortimer's August 2014

---

[22] To the extent that Plaintiffs bring a claim under § 1983 for ADA Duda's alleged failure to read C.S. his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966), that claim fails. "*Miranda* violations, absent coercion, do not rise to the level of constitutional violations actionable under § 1983." *Jocks* v. *Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003). Though Plaintiffs make passing reference to the "coercive setting" in which ADA Duda

neglect proceedings, and a third as to the September 2014 "proceedings" against Mortimer. (TAC ¶¶ 433-38). To state a claim for malicious prosecution under New York law, a plaintiff must show "[i] the initiation or continuation of a criminal proceeding against plaintiff; [ii] termination of the proceeding in plaintiff's favor; [iii] lack of probable cause for commencing the proceeding; and [iv] actual malice as a motivation for defendant's actions. *Jocks* v. *Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) (internal quotation marks and citation omitted). To state a malicious prosecution claim under § 1983, there must also have been a post-arraignment seizure — such as "attending criminal proceedings and obeying the conditions of bail[.]" *Id.* Probable cause is a complete defense. In the context of malicious prosecution claims, a defendant must have had probable cause to believe that the charged individual could be successfully prosecuted. *Minott* v. *Duffy*, No. 11 Civ. 1217 (KPF), 2014 WL 1386583, at *15 (S.D.N.Y. April 8, 2014).

### a. C.S.'s Claim Survives

C.S's claim as to his April 2014 arrest survives in part. The Court understands Plaintiffs to raise this claim against both Officer Hurst and ADA Duda, and thus begins by discussing which Defendants are potentially liable. A criminal proceeding is initiated "by filing charges or other accusatory instruments," *Minott*, 2014 WL 1386583, at *15 (citations omitted), and this

---

spoke to C.S., Plaintiffs do not allege any facts showing how the setting was coercive. Accordingly, the proper remedy for any *Miranda* violation flowing from that interview is exclusion of the improperly-obtained statements at a subsequent trial, not civil liability under § 1983. Regardless of whether Plaintiffs raise this claim under a malicious prosecution theory or a substantive due process theory, it fails.

can be done by a police officer who "is found to play[] an active role in the prosecution, such as … importuning the authorities to act," *Manganiello* v. *City of N.Y.*, 612 F.3d 149, 163 (2d Cir. 2010) (internal quotation marks and citation omitted).

C.S.'s claim against ADA Duda fails on several bases:  *First*, C.S.'s claim against ADA Duda in his official capacity is barred by the Eleventh Amendment.  *D'Alessandro* v. *City of N.Y.*, 713 F. App'x 1, __, 2017 WL 4641256, at *5 (2d Cir. Oct. 17, 2017) (summary order) (citing *Ying Jing Gan* v. *City of N.Y.*, 996 F.2d 522, 536 (2d Cir. 1993)).  *Second*, C.S.'s claim against ADA Duda in his individual capacity is barred by absolute prosecutorial immunity.  *Giraldo* v. *Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) ("Prosecutorial immunity from § 1983 liability is broadly defined" and extends to decisions regarding "whether and when to prosecute[.]" (citing *Imbler* v. *Pachtman*, 424 U.S. 409, 430 (1976)).  *Third*, even if ADA Duda were not immune from suit on this claim, he properly asserts a probable cause defense:  He was presented with information from Officer Hurst that Mortimer had accused C.S. of shoving her and, while holding a pair of pliers, threatening her with further violence if she did not yield to his demands.  (Dkt. #104-3).  Based on these facts, Duda filed a misdemeanor criminal complaint against C.S. for, among other things, assault, menacing, and criminal possession of a weapon.  (*Id.*).

C.S.'s claim against Officer Hurst remains.  In large measure, this is because the TAC disclaims the narrative presented in the criminal complaint, i.e., that C.S. shoved or threatened Mortimer during their dispute on April 12,

2014. (*E.g.*, TAC ¶¶ 137-40). Instead, the TAC states that Plaintiffs had a dispute after C.S. arrived home well past his curfew during which a "door accidentally closed on her finger"; that Mortimer explained to Officer Hurst that the door had closed by accident; and that Officer Durrowes, who responded to the 911 call with Hurst, "recorded in his incident report that [C.S.] had wielded no weapon against [Mortimer]." (*Id.* at ¶¶ 120-29). The TAC further alleges that Hurst elicited a false confession from C.S. and charged him with criminal conduct for which there was "no evidentia[ry] basis." (*Id.* at ¶¶ 130-39).

Taking all of Plaintiffs' well-pleaded allegations to be true, the Court understands that the information available to Hurst at the time he initiated criminal proceedings against C.S. was as follows: Plaintiffs had an argument during which Mortimer was injured when a door accidentally closed on her hand, and Officer Durrowes noted that C.S. did not threaten Mortimer with a weapon. While Hurst's affidavit in the criminal complaint states that Mortimer told him that C.S. had acted violently toward her and threatened her with pliers, Plaintiffs are quite clear in their allegation that Mortimer said no such thing. (*Compare* Dkt. #104-3, *with* TAC ¶ 132). The documents submitted in connection with this motion give the Court reason to doubt Plaintiffs' current account of the events; nevertheless, the allegations in the TAC, taken as true, foreclose a finding that Hurst had probable cause to believe C.S. could be successfully prosecuted based on the facts known to Hurst at the time.

Defendants argue that even if Hurst lacked probable cause, he is qualifiedly immune because he had an objectively reasonable basis, and thus

"arguable probable cause," to initiate criminal proceedings against C.S. (NYPD Br. 13 (quoting *Jenkins*, 478 F.3d at 87)). To review, an officer is protected by qualified immunity where "[i] his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or [ii] it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Jenkins*, 478 F.3d at 87 (internal quotation marks and citation omitted). If the events of April 12, 2014, transpired as Plaintiffs say they did, Hurst could not have had an objectively reasonable basis to believe that C.S. should be charged with assault, harassment, menacing, and criminal possession of a weapon. Hurst is thus not protected by qualified immunity, and this claim against him may proceed.

### b. Mortimer's Claim as to the Neglect Proceedings Fails

Plaintiffs also assert a malicious prosecution claim on behalf of Mortimer in connection with the "August 2014 neglect proceedings against [ ] Mortimer and the September 2014 proceedings against [ ] Mortimer." (TAC ¶ 435). This claim fails. The Second Circuit has acknowledged that the law remains unsettled regarding whether child removal proceedings can form the basis of a malicious prosecution claim. *See Walker* v. *City of N.Y.*, 621 F. App'x 74, 76 (2d Cir. 2015) (summary order); *see also McCaul* v. *Ardsley Union Free Sch. Dist.*, 514 F. App'x 1, 4-5 (2d Cir. 2013) (summary order) (assuming without deciding that a neglect proceeding could give rise to a malicious prosecution claim). Where a civil suit forms the basis of a malicious prosecution claim, the plaintiff must make "a showing of some interference with plaintiff's person or

property, by the use of such provisional remedies as arrest, attachment, replevin or injunction, or other burden imposed … beyond the ordinary burden of defending a law suit." *McCaul*, 621 F. App'x at 4 (citing *Yuan* v. *Rivera*, 48 F. Supp. 2d 335, 349 (S.D.N.Y. 1999) (holding that depriving parent of custody over her children for "several months" satisfied this "special injury" requirement)).

Assuming for the sake of argument that Mortimer's loss of custody over C.S. amounted to a "special injury" and that the neglect proceedings were favorably terminated against her, her claim would still fail because ACS had a reasonable basis to initiate neglect proceedings against her.  By Plaintiffs' own telling, the police were called to their home three times in a course of several months to address domestic disputes between Mortimer and C.S.; an NYPD officer reported one of the incidents to ACS as troubling; ACS questioned the adequacy of Mortimer's homeschooling, and had reason to believe that C.S. was not receiving any education during the periods when he was not living in Mortimer's home; and Mortimer's mother had initiated an earlier Family Court proceeding against Mortimer that led to an investigation.  (TAC ¶¶ 37-42, 59-65, 120-25, 231-39; Pl. Opp. 3).  These facts indicate that the ACS Defendants acted with probable cause when they initiated proceedings against Mortimer in August 2014 and that, even if they did not, their actions were objectively reasonable and they are qualifiedly immune from suit on this claim.

### c. Mortimer's Claim as to Her September 2014 Arrest Fails

While the TAC alleges that Mortimer was "arrest[ed] ... pursuant to the [C.S.] warrant" and was subject to "proceedings" in September 2014, the TAC does not explain (i) what type of proceedings these were; (ii) how these proceedings were terminated, aside from saying that they were terminated favorably; or (iii) who acted with malice or without probable cause in initiating these proceedings. (TAC ¶¶ 364-65, 434-35). Plaintiffs' opposition brief appends documents that corroborate Mortimer's assertion that she was arrested, but these documents do not clarify what, if any, charges were brought against her. (Pl. Opp., Ex. 1, 12). Even with the solicitude afforded *pro se* litigants, the Court cannot find enough information in the TAC to understand the basis for this claim and, accordingly, it is dismissed.[23]

### 9. Plaintiffs' Claim for Denial of the Right to a Fair Trial Succeeds as to C.S. but Not as to Mortimer[24]

"When [an investigating official] creates false information likely to influence a jury's decision and forwards that information to prosecutors, he

---

[23] It appears that the TAC may be missing four pages — it jumps from page 42 to page 46. It is not clear whether this was an inadvertent omission or a conscious decision, but, either way, the Court will not speculate as to what those pages, if they exist, say. Plaintiffs' first three complaints state that Mortimer was arrested and detained at Rikers Island, but that she is not aware why she was detained because there are no records of her incarceration or criminal prosecution. (*See, e.g.*, Dkt. #53 ¶¶ 203-05). This is Plaintiffs' fourth complaint, and they have not sought leave to amend further. Without any showing from Plaintiffs as to the necessity of amendment or how it would cure Mortimer's deficient malicious prosecution claim, the Court dismisses this claim with prejudice.

[24] The Court understands Plaintiffs to be raising a denial of the right to fair trial claim as to Officer Hurst, but not ADA Duda. To the extent Plaintiffs meant to include ADA Duda, the claim fails for the Eleventh Amendment and prosecutorial immunity reasons discussed in the text.

violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti* v. *N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). Though probable cause is not a complete defense, a "plaintiff must still show that the alleged fabrication caused a deprivation of liberty." *Torres* v. *City of N.Y.*, No. 16 Civ. 6719 (BMC), 2017 WL 4325822, at *5 (E.D.N.Y. Sept. 27, 2017) (ellipsis omitted) (reconciling *Ricciuti*, 124 F.3d at 127 (holding that probable cause is a complete defense), and *Zahrey* v. *Coffey*, 221 F.3d 342, 348 (2d Cir. 2000) (holding that a plaintiff must show causation)). "It is of no matter that a plaintiff's case is never put before a grand or trial jury — this claim may be sustained where charges are dismissed before trial." *Rodriguez* v. *City of N.Y.*, No. 16 Civ. 744 (KPF), — F. Supp. 3d —, 2018 WL 1276831, at *11 (S.D.N.Y. Mar. 5, 2018) (citing *Ricciuti*, 124 F.3d at 130).

Plaintiffs allege that Defendant Officer Hurst gave a false statement to ADA Duda that was contrary to the narrative Mortimer told him, and that resulted in criminal charges being brought against C.S. (TAC ¶¶ 126-40). Assuming Plaintiffs' allegations to be true, and for much the same reasons why the Court cannot dismiss C.S.'s malicious prosecution claim, C.S.'s denial of a right to a fair trial claim survives against Officer Hurst. *See Rodriguez*, 2018 WL 1276831, at *11 (denying summary judgment on malicious prosecution and denial of fair trial claims where questions remained as to probable cause). If the events of April 12, 2014, occurred as Plaintiffs describe, then C.S. has a plausible claim that Officer Hurst's statements caused the deprivation of C.S.'s

liberty.  But Mortimer's claim against the ACS Defendants in connection with

the Family Court proceedings fails because she has not shown a deprivation of

a liberty interest caused by the ACS Defendants' statements.  And even if

Mortimer were able to make this showing, the ACS Defendants are entitled to

qualified immunity because they acted with a reasonable basis to pursue the

removal of C.S. from the home based on the information available to them at

the time.

### 10.    Plaintiffs' Claims for Malicious Abuse of Process Fail

Under New York law, Plaintiffs must show "that defendant [i] employed

regularly issued legal process to compel performance or forbearance of some

act, [ii] with the intent to do harm without excuse or justification, and [iii] in

order to obtain a collateral objective that is outside the legitimate ends of the

process." *Arrington* v. *City of N.Y.*, 628 F. App'x 46, 49 (2d Cir. 2015) (summary

order) (brackets omitted) (quoting *Savino*, 331 F.3d at 76).  To raise this claim

under § 1983, a plaintiff must allege abuse of criminal process.  *Cook* v.

*Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994).  What is more, in the criminal context,

a plaintiff must allege "a collateral purpose beyond or in addition to … criminal

prosecution." *Savino*, 331 F.3d at 77.

Plaintiffs' claims falter — both under § 1983 and under New York law —

in failing to allege a collateral objective.  The TAC states that "Defendants

intentionally made use of regularly issued criminal or civil process with an

intent to do harm without excuse or justification, and this was done in a

perverted manner in order to obtain a collateral objective."  (TAC ¶ 444).  But

59

this is merely a legal conclusion couched as a factual allegation, and the Court is not bound to accept it. *See Iqbal*, 556 U.S. at 678. The TAC makes no factual allegation, let alone a plausible one, of a collateral objective of any sort either as to the neglect proceedings in Family Court or as to the criminal proceeding against C.S. In other words, while Plaintiffs attack the validity of these proceedings, they do not state that either was brought for a purpose other than the removal of C.S. from the home or the prosecution of C.S. for an alleged attack against Mortimer. Accordingly, Plaintiffs' seventh cause of action is dismissed.[25]

### 11. Plaintiffs' Claim for First Amendment Retaliation Fails

The TAC seeks relief for "Defendants['] … misconduct in response to [ ] Mortimer's speech insisting that Defendants demonstrate that they followed due process before seeking to infringe upon her rights." (TAC ¶ 450). Specifically, Plaintiffs allege that Defendant Officers Arriaga, Ancion, and Lopez, and ACS Caseworker White arrested Mortimer pursuant to a "fabricated warrant" following her "insistence on their roughly seven prior visits to her home that they show her a warrant before she would allow them to conduct a search." (*Id.* at ¶ 451).

This conduct, taken as true, does not amount to a claim for First Amendment retaliation. "To state a claim for First Amendment retaliation, a

---

[25] The NYPD Defendants construe the TAC as raising a claim for malicious abuse of process, and a corresponding *Monell* claim, stemming from Officer Caraballo's response to Plaintiffs' July 23, 2014 dispute. (NYPD Br. 14-16). The Court does not understand the TAC to assert these claims in any regard and certainly not plausibly.

plaintiff must plausibly allege that '[i] her speech or conduct was protected by the First Amendment; [ii] the defendant took an adverse action against her; [and] [iii] there was a causal connection between this adverse action and the protected speech.'" *Stajic* v. *City of N.Y.*, 214 F. Supp. 3d 230, 235 (S.D.N.Y. 2016) (original brackets omitted) (quoting *Matthews* v. *City of N.Y.*, 779 F.3d 167, 172 (2d Cir. 2015)). Retaliation is only actionable where it would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Ford* v. *Palmer*, 539 F. App'x 5, 6 (2d Cir. 2013) (summary order) (quoting *Dawes* v. *Walker*, 239 F.3d 489, 493 (2d Cir. 2001)). Probable cause for an arrest vitiates a First Amendment retaliation claim. *Golodner* v. *City of New London*, 443 F. App'x 622, 624 (2d Cir. 2011) (summary order) ("[W]e affirm the District Court's dismissal on the alternate ground that the existence of probable cause is a complete defense to a claim of retaliatory arrest." (citing *Mozzochi* v. *Borden*, 959 F.3d 1174, 1179 (2d Cir. 1992))); *see also Gonzalez* v. *Bronx Cty. Hall of Justice Court Officer Mark Hirschman Shield 7421*, No. 15 Civ. 810 (GHW), 2017 WL 435829, at *8 (S.D.N.Y. Jan. 31, 2017) (collecting cases).

Plaintiffs' allegations as to Mortimer's arrest are inconsistent. The TAC recites that Mortimer was arrested without a warrant and, later, that she was arrested pursuant to a warrant for C.S. (*Compare* TAC ¶ 340, *with id.* at ¶ 365). Plaintiff's opposition brief changes tack: "Even if Plaintiffs were to accept that the NYPD Defendants had a valid arrest warrant for Mortimer, NYPD Defendants did not have a 'search warrant' when they came to the

Mortimer home to search for [C.S.]" (Pl. Opp. 13). Plaintiffs continue that Mortimer was not presented with a warrant for her arrest *at the time* and, notably, that "Mortimer never saw the warrant for her arrest until after her arrest." (*Id.*).

The Court is mindful that these more equivocal allegations come after Plaintiffs were presented with the NYPD Defendants' motion, which appended a copy of the Family Court warrant issued for Mortimer's arrest. (Dkt. #112-4). The TAC's allegations put the existence of a warrant for Mortimer's September 2014 arrest directly in issue and, in this regard, the warrant is integral to the TAC insofar as the TAC "relies heavily upon its terms and effect." *Goel*, 820 F.3d at 559 (citation omitted). The warrant, dated September 2, 2014, does indeed state "YOU ARE THEREFORE COMMANDED forthwith to arrest KYM MORTIMER, and bring said person before this Court to be dealt with according to law." (Dkt. #112-4).[26] C.S. is also named on the warrant, and this comports with the allegation in the TAC that there was a hearing in the Family Court on September 2, 2014 (at which Mortimer was present), wherein a warrant was issued for C.S.'s arrest. (TAC ¶¶ 337-38). The existence of a valid arrest warrant precludes Mortimer's claim for a retaliatory arrest, and thus Plaintiffs' eighth cause of action is dismissed.

---

[26]     The Court notes that Mortimer's name appears on certain documents spelled "Kym." There is no claim that this is not the same person as Plaintiff Kim Mortimer.

### 12. Plaintiffs' Claim for Failure to Intervene Against Officer Durrowes Fails

Plaintiffs bring a failure to intervene claim on behalf of C.S. against Officer Durrowes for his purported failure to correct Officer Hurst's "false version of [C.S.'s] confession … which was that [C.S.] physically assaulted [ ] Mortimer with a deadly firearm." (TAC ¶ 144). Plaintiffs allege that Durrowes was in a position to prevent Hurst from making this misstatement to ADA Duda.

A law enforcement officer can be liable under § 1983 for a failure to intervene to prevent the deprivation of constitutional rights where "[i] the officer had a realistic opportunity to intervene and prevent the harm; [and] [ii] a reasonable person in the officer's position would know that the victim's constitutional rights were being violated[.]" *Guerrero* v. *City of N.Y.*, No. 16 Civ. 516 (JPO), 2017 WL 2271467, at *3 (S.D.N.Y. May 23, 2017). Here, however, Plaintiffs misapprehend the statement that Officer Hurst actually made to ADA Duda when he swore out the criminal complaint against C.S. C.S. was charged with, *inter alia*, criminal possession of a weapon in the fourth degree in violation of New York Penal Law § 265.01(2). (Dkt. #104-3). This charge encompasses many different types of weapons, including firearms. *See* N.Y. Penal Law § 265.01. In the first portion of the criminal complaint, Hurst lists, in boilerplate fashion, the elements of the various charges against C.S. and, on the second page, provides the factual basis for the charges. (Dkt. #104-3). Nowhere in the fact section does Hurst say that C.S. wielded a firearm against Mortimer. (*Id.*). It thus appears that Plaintiffs mistake Hurst's recitation of the

various possible elements of criminal possession of a weapon in the fourth

degree for a factual allegation being made against C.S. Because the Court does

not believe Hurst to have made the alleged misstatement in the criminal

complaint, it cannot find that Durrowes failed to prevent the misstatement.

Accordingly, Plaintiffs' ninth cause of action is dismissed.

### 13. Plaintiffs' Claims for Negligent Placement in Foster Home and Negligent Supervision of Care by the Foster Home Fail

Plaintiffs assert claims of negligent placement of C.S. in a foster home

and negligent supervision of care by the foster home. (TAC ¶¶ 465-70). The

Court understands Plaintiffs to bring these claims against the ACS Defendants

and the Children's Village Defendants, stemming from three allegedly negligent

acts: (i) the administration of vaccines, medicine, and psychological counseling

to C.S.; (ii) C.S.'s placement in a foster home in an "unsafe and unhealthy"

neighborhood near a drug rehabilitation center; and (iii) insufficient

supervision of C.S. by his foster parents, who allowed him to remain out late at

night and run away.[27]

Plaintiffs' claims fail to the extent they are predicated on any action (or

inaction) by C.S.'s foster parents because "[government entities] and foster care

agencies cannot be vicariously liable for the negligent acts of foster parents,

who are essentially contract service providers." *Keizer* v. *SCO Family of Servs.*,

991 N.Y.S.2d 103, 104 (2d Dep't 2014) (citing *Blanca C.* v. *Cty. of Nassau*, 480

---

[27]     As alleged in the TAC, these claims could be construed as only reaching the conduct of C.S.'s foster parents, and not that of Children's Village. But in light of the solicitude Plaintiffs are owed, the Court analyzes the broadest reading of this claim.

N.Y.S.2d 747, 752 (2d Dep't 1984), *aff'd*, 65 N.Y.2d 712 (1985)).  Government entities and foster care agencies can, however, be liable in negligence for improper selection of foster parents and insufficient supervision of the foster home.  *Id.*  "[T]o find that a child care agency breached its duty to adequately supervise the children entrusted to its care, a plaintiff must establish that the agency 'had sufficiently specific knowledge or notice of the dangerous conduct which caused injury; that is, that the third-party acts could reasonably have been anticipated.'"  *Simpson* v. *Cty. of Dutchess*, 826 N.Y.S.2d 678, 680 (2d Dep't 2006) (quoting *Mirand* v. *City of N.Y.*, 84 N.Y.2d 44, 49 (1994)).

Plaintiffs' claims fail because they do not allege any injuries that flow from these purportedly negligent acts.  While the TAC alleges that Mortimer did not want any medical or psychological care provided to C.S. while he was in Children's Village's custody, the TAC does not allege that C.S. was harmed by the vaccinations, medicine, or counseling he received.  In a single sentence, the TAC alleges that "Mortimer believes that [C.S.] was sexually assaulted at the Children's Village holding facility" (TAC ¶ 319), but the TAC does not provide any details explaining why Mortimer believes this to be true, when it happened, how it happened, or any other basis to find Plaintiffs have plausibly pled this claim.[28]  Finally, the TAC is likewise devoid of any suggestion that C.S. was so harmed by (i) the location of his foster home, (ii) the fact that he was permitted

---

[28]    Tellingly, C.S. makes no allegation in this regard.

to stay out late at night, or (iii) the lack of parental supervision that he was driven to escape to Germany.[29]

### 14. Plaintiffs' Claims for False Arrest and False Imprisonment Fail

To state a claim for false arrest under New York law "a plaintiff must show that [i] the defendant intended to confine him, [ii] the plaintiff was conscious of the confinement, [iii] the plaintiff did not consent to the confinement and [iv] the confinement was not otherwise privileged." *Jocks*, 316 F.3d at 134-35. A false imprisonment claim similarly requires a showing "[i] that the defendant intended to confine the plaintiff, [ii] that the plaintiff was conscious of the confinement and did not consent to the confinement, and [iii] that the confinement was not otherwise privileged." *Martinez* v. *City of Schenectady*, 97 N.Y.2d 78, 85 (2001). Probable cause or a warrant for the plaintiff's arrest are complete defenses to either claim. *Jenkins*, 478 F.3d at 84; *Rutigliano* v. *City of N.Y.*, 326 F. App'x 5, 7 (2d Cir. 2009) (summary order) (citing *Zanghi* v. *Inc. Vill. of Old Brookville*, 752 F.2d 42, 45 (2d Cir. 1985)).

---

[29] The Court notes that, because this claim fails under a negligence theory, it necessarily fails to the extent C.S. recasts it under § 1983 as a violation of his substantive due process right to be free from harm while in the ACS Defendants' and the Children's Village Defendants' care. *See S.W. ex rel. Marquis-Abrams* v. *City of N.Y.*, 46 F. Supp. 3d 176, 194 (E.D.N.Y. 2014) ("[C]hildren in foster care have a substantive due process right under the Fourteenth Amendment to protection from harm." (internal quotation marks and brackets omitted)). To state a substantive due process claim on this theory, a plaintiff must show that the foster care provider acted with deliberate indifference, "meaning that its top supervisory personnel exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk of injury was a proximate cause of plaintiffs['] deprivation of rights under the Constitution." *Id.* at 196 (ellipsis omitted) (quoting *Doe* v. *N.Y. City Dep't of Soc. Servs.*, 649 F.2d 134, 141 (2d Cir. 1981)). C.S.'s claim thus fails for the additional reason that the TAC does not suggest that the ACS Defendants or Children's Village were deliberately indifferent to a known harm or risk.

Whether brought under § 1983 or state law, the elements of these claims are the same. *Jenkins*, 478 F.3d at 84; *Rutigliano*, 326 F. App'x at 7.

Plaintiffs allege false arrest and false imprisonment based on (i) C.S.'s April 2014 arrest and detention thereafter, and (ii) Mortimer's September 2014 arrest and detention thereafter. (TAC ¶¶ 471-76). Both claims fail as to both events. To review, C.S. was arrested in April 2014 for, among other things, assault in the third degree and menacing in the third degree following his dispute with his mother in which her hand was visibly injured and she required stitches. (*Id.* at ¶¶ 120-37). A person commits assault in the third degree under New York Penal Law § 120.00 if he intentionally or recklessly causes injury to another person, and commits menacing in the third degree under New York Penal Law § 120.15 if he "by physical menace" intentionally places another person in fear of death or injury. That Plaintiffs disclaim C.S.'s guilt is of no matter — the NYPD Defendants had probable cause based on the scene they encountered that night to arrest C.S. for these offenses and to detain him thereafter. Plaintiffs' claims stemming from Mortimer's September 2014 arrest fail for the simple reason that she was arrested pursuant to a Family Court warrant. Accordingly, Plaintiffs' twelfth cause of action is dismissed.

### 15. Plaintiffs' Claims for Negligent Infliction of Emotional Distress and Intentional Infliction of Emotional Distress Fail

Plaintiffs assert claims for negligent and intentional infliction of emotional distress. A cause of action for intentional infliction of emotional distress ("IIED") has four elements: "[i] extreme and outrageous conduct;

[ii] intent to cause, or disregard of a substantial probability of causing, severe emotional distress; [iii] a causal connection between the conduct and injury; and [iv] severe emotional distress." *Scollar* v. *City of N.Y.*, — N.Y.S.3d —, 2018 WL 1414084, at *3 (1st Dep't Mar. 22, 2018) (internal quotation marks and citation omitted). A claim of negligent infliction of emotional distress ("NIED") does not require extreme or outrageous conduct. *Taggart* v. *Costabile*, 14 N.Y.S.3d 388, 397 (2d Dep't 2015). A plaintiff may recover for NIED by showing "a breach of a duty of care resulting directly in emotional harm ... even though no physical injury occurred," as long as "the mental injury [is] a direct, rather than a consequential, result of the breach, and the claim ... possess[es] some guarantee of genuineness." *Id.* (citations omitted). In general, the latter element requires "a specific, recognized type of negligence that obviously has the propensity to cause extreme emotional distress, 'such as the mishandling of a corpse or the transmission of false information that a parent or child had died.'" *J.H.* v. *Bratton*, 248 F. Supp. 3d 401, 416 (E.D.N.Y. 2017) (quoting *Taggart*, 14 N.Y.S.3d at 396).

ADA Duda is immune from either claim as they relate to his prosecution of C.S. *D'Alessandro*, 2017 WL 4641256, at *5; *Giraldo*, 694 F.3d at 165. Plaintiffs' claims also fail against the ACS Defendants, who are immune under New York Social Services Law § 419 for civil liability in connection with their good-faith reporting and investigation of suspected child abuse or neglect without a showing of actual malice. *See Zornberg* v. *N. Shore Univ. Hosp.*, 815 N.Y.S.2d 719, 720 (2d Dep't 2006). The NYPD Defendants are not liable for

NIED or IIED in connection with their response to Plaintiffs' April 2014 and July 2014 disputes, or for their attempts to arrest C.S. and Mortimer pursuant to a Family Court warrant, insofar as the allegations in the TAC lack indicia of genuineness and are not sufficiently outrageous or extreme. *See J.H.*, 248 F. Supp. 3d at 416.

Finally, these claims fail as to the Children's Village Defendants. Children's Village Caseworker White is alleged to have harassed Mortimer when White accompanied NYPD officers who sought to effect the warrant for Mortimer's and C.S's arrests and when White intercepted Mortimer's phone calls, emails, and postal mail; Children's Village Physician Dr. Waite is alleged to have administered vaccines and medicines to C.S. against Mortimer's wishes. (TAC ¶¶ 337-60). These allegations are either facially implausible or insufficient to constitute the obvious negligence or extreme conduct needed to prevail on an NIED or IIED claim.

### 16. Plaintiffs' Claims for Trespass to Land and Trespass to Chattel Fail

Plaintiffs fail to state claims for trespass to land or chattels. (*See* TAC ¶¶ 486-89). To state these claims under New York law, a plaintiff must show that the defendant intentionally entered his or her land and committed a "wrongful use without justification or consent," *Green* v. *City of Mt. Vernon*, 96 F. Supp. 3d 263, 293 (S.D.N.Y. 2015), and that the defendant intentionally used or meddled with a chattel in the plaintiff's possession such that the chattel was "impaired as to its condition, quality, or value," *Register.com, Inc.* v. *Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (citations omitted). Officers

Ancion and Stena and ACS Caseworker White entered Mortimer's apartment to effect a valid arrest warrant for C.S., and thus their entry was not an improper trespass. *Dockery* v. *Tucker*, No. 97 Civ. 3584 (ARR), 2008 WL 2673307, at *11 (E.D.N.Y. June 26, 2008). The TAC does not make any allegation as to a chattel that was impaired by any of the Defendants. Plaintiffs' fourteenth cause of action is dismissed.

### 17. Plaintiffs' Claims for Slander and Libel Fail

"Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Lan Sang* v. *Ming Hai*, 951 F. Supp. 2d 504, 517 (S.D.N.Y. 2013). Under New York law, a plaintiff must show "a false statement, published without privilege or authorization to a third party, fault[,] and either causing special harm or constituting defamation *per se*." *Id.* (internal quotation marks and ellipses omitted). Whether a statement is defamatory is a legal question that may be resolved by a court in the first instance. *Id.* "Special harm" is the "loss of something having economic or pecuniary value." *Liberman* v. *Gelstein*, 80 N.Y.2d 429, 590 (1992). Among the bases for defamation *per se*, is a statement that "charge[s] the plaintiff with a serious crime." *Albert* v. *Loksen*, 239 F.3d 256, 271 (2d Cir. 2001).

This claim fails against ADA Duda — he is immune from suit under the Eleventh Amendment and enjoys absolute prosecutorial immunity for any allegedly defamatory statements made in the course of C.S.'s prosecution. *D'Alessandro*, 2017 WL 4641256, at *5; *Giraldo*, 694 F.3d at 165. This claim

also fails against the NYPD Defendants and the ACS Defendants for statements made during C.S.'s prosecution and the Family Court neglect proceedings.[30] Police officers are immune from defamation claims flowing from statements made in the performance of their official duties. *Birmingham* v. *Kelly*, No. 11 Civ. 2965 (NGG), 2011 WL 2728121, at *1 (E.D.N.Y. July 11, 2011) (citing *White* v. *Frank*, 855 F.2d 956, 958-60 (2d Cir. 1988)). And, as noted above, the ACS Defendants are immune from liability for good-faith reporting of suspected child abuse, absent an allegation of actual malice. *Zornberg*, 815 N.Y.S.2d at 720. Because Plaintiffs have not alleged that the ACS Defendants acted with malice, these claims fail. Accordingly, Plaintiffs' fifteenth cause of action is dismissed.

### 18. Plaintiffs Fail to State a Claim for Municipal Liability Under *Monell*

#### a. Municipal Liability Pursuant to a Policy or Custom

Plaintiffs allege that the events described in the TAC are not isolated incidents, but rather stem from "unconstitutional customs and policies [that] may be inferred from repeated occurrences of similar wrongful conduct," as evidenced by other actions filed in this District and in the Eastern District of New York. (TAC ¶ 393). In consequence of these policies, "the City is aware that many ACS officers and many NYPD officers, including the individual Defendants, fabricate evidence and falsely arrest individual persons for objectives outside the ends of justice." (*Id.*). Plaintiffs allege further that ACS

---

[30] The Court does not understand the TAC to allege any defamatory statements by the Children's Village Defendants.

often illegally removes children from their homes based on false allegations against the parents and that "95% of the families targeted are African American and Latino families from low-income communities." (*Id.* at ¶¶ 394-95). In this vein, Plaintiffs allege that "[t]he harassment of [ ] Mortimer was racially motivated." (*Id.* at ¶ 329).

"To prevail against a municipality on a § 1983 claim, a plaintiff must demonstrate both an injury to a constitutionally protected right and that the injury was caused by a policy or custom of the municipality or by a municipal official responsible for establishing final policy." *Hartline* v. *Gallo*, 546 F.3d 95, 103 (2d Cir. 2008) (internal quotation marks and citation omitted). Absent an underlying constitutional violation, the Court need not address municipal liability. *Segal* v. *City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006). Given this restriction, the Court need only address Plaintiffs' *Monell* claim as it relates to their allegations that (i) Caseworker Wilson failed to provide constitutionally required notice of removal proceedings; (ii) Officer Hurst initiated criminal proceedings against C.S. without probable cause; and (iii) Officer Hurst provided a false narrative that violated C.S.'s right to a fair trial. While these individual claims may have survived Defendants' motions to dismiss, they fail as *Monell* predicates because Plaintiffs do not adequately allege that they are the product of any City-wide policies or customs. The TAC summarily states that ACS's employees fabricate evidence and remove children from their homes based on false accusations against the parents, and that police officers fabricate evidence and falsely arrest people "for objectives outside the ends of

justice," but utterly fails to explain how these actions flow from official policies or customs. (TAC ¶¶ 393-95). Conclusory allegations of this type do not provide a basis for municipal liability under *Monell*.

### b.  Municipal Liability Pursuant to a Failure to Train

Plaintiffs also raise a failure to train claim for municipal liability, insofar as they allege that the "City is thus aware that its improper training and customs and policies have often resulted in a deprivation of individuals' constitutional rights," but has "failed to take corrective action." (TAC ¶ 396). Moreover, Plaintiffs allege, the City knew that the NYPD Defendants "lacked the objectivity, temperament, maturity, discretion[,] and disposition to be employed as police officers" and, even still, failed to properly train them. (*Id.* at ¶ 397).

To state a claim for municipal liability on a failure to train theory, a plaintiff must allege an underlying constitutional violation that was occasioned by a municipality's failure to train its employees and, further, that the failure to train amounted to deliberate indifference. *Rodriguez*, 2018 WL 1276831, at *14. Courts are skeptical of these claims because "a municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* (quoting *Connick* v. *Thompson*, 563 U.S. 51, 61 (2011) (brackets omitted)). A plaintiff can show deliberate indifference sufficient to impose *Monell* liability where

> [i] a policymaker knows "to a moral certainty" that city employees will confront a particular situation; [ii] the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or there is a history of employees mishandling the situation; and [iii] the wrong choice by

the city employee will frequently cause the deprivation
of a citizen's constitutional rights.

*Wray* v. *City of N.Y.*, 490 F.3d 189, 195-96 (2d Cir. 2007) (internal quotation marks and citation omitted).  A single violation does not give rise to municipal liability for failure to train.  *Connick*, 563 U.S. at 54.

Here as well, the Court need only analyze Plaintiffs' failure to train arguments as they relate to the § 1983 claims that remain.  *See Barrett* v. *City of Newburgh*, No. 17-1185-cv, — F. App'x —, 2017 WL 6540497, at *2 (2d Cir. Dec. 21, 2017) (summary order) (citing *Segal*, 459 F. 3d at 219).  But Plaintiffs' failure to train allegations are circular — saying, in effect, that because Defendants violated Plaintiffs' constitutional rights, the City failed to train its employees properly.  (*See* TAC ¶¶ 396-97).  The TAC also states that ACS and the NYPD have, on prior occasions, improperly removed children from their parents' homes or fabricated evidence, but Plaintiffs provide no details about comparably violative conduct.  (*See id.*).[31]  Plaintiffs' failure to train claim thus fails.

## CONCLUSION

For the foregoing reasons, ADA Duda's and the Children's Village Defendants' motions to dismiss are GRANTED in their entirety.  The Clerk of Court is directed to terminate ADA Timothy Duda, Children's Village,

---

[31]     As noted at *supra* note 22, the TAC appears to be missing pages.  Though the Court cannot be certain whether this omission was accidental or intended, it similarly cannot respond to allegations that are not put before it.  So while the Court observes that these pages could contain additional allegations as to municipal liability, the Court cannot opine on those claims.  The Court notes that Plaintiffs' allegations as to municipal liability in their first three complaints were similarly conclusory.  (*See, e.g.*, Dkt. #53 ¶¶ 208-11).

Children's Village Caseworker Shelley White, and Children's Village Physician Douglas Waite as parties to this action.

The ACS Defendants' motion is GRANTED as to the City of New York; ACS Caseworkers Booker, Salinas, Vargas, and Barnes; ACS Investigative Consultant Haymes; and ACS Supervisors Caldwell, Osborne, Castan, Vorhees, and Browne. The Clerk of Court is directed to terminate these parties. The ACS Defendants' motion is DENIED as to Mortimer's procedural due process claim against ACS Caseworker Wilson.

The NYPD Defendants' motion is GRANTED as to the City of New York, and Officers Ancion, Caraballo, Arriaga, Lopez, Stena, Shelley, and Durrowes. The Clerk of Court is directed to terminate these parties. The NYPD Defendants' motion is DENIED as to C.S.'s claims for malicious prosecution and denial of the right to a fair trial against Officer Hurst.

The Clerk of Court is directed to terminate the motions at Docket Entries 103, 106, 111, and 122.

**The remaining parties are directed to submit a proposed Case Management Plan for the Court's consideration on or before May 1, 2018.** The parties should be mindful that discovery in this case will only be permitted as it pertains to Plaintiffs' three remaining claims; discovery may not be taken as to any claim dismissed in this Opinion.

SO ORDERED.

Dated:     March 29, 2018
           New York, New York

_____
            KATHERINE POLK FAILLA
            United States District Judge

*A copy of this Order was mailed by Chambers to:*

Kim Mortimer
60 West 91st Street
New York, New York 10024

C.S.
[c.s.]de@gmail.com