UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KIM MORTIMER and C.S.,

                                    Plaintiffs,

                    -v.-

NYC ACS CASEWORKER BEVERLY
WILSON, *in her individual and official
capacities*, and NYPD OFFICER KYLE
HURST, *in his individual and official
capacities*,

                                    Defendants.

15 Civ. 7186 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiffs Kim Mortimer and C.S.[1] are mother and son.  At times, their relationship has been fraught.  In 2014, a series of events led first to C.S.'s arrest and removal from Mortimer's home and ultimately to C.S.'s flight to Germany and Mortimer's arrest thereafter.  Plaintiffs initiated this civil rights action under 42 U.S.C. § 1983 in 2015, alleging that various defendants — including the City of New York, several caseworkers and supervisors at the Administration for Children's Services (the "ACS"), officers of the New York City Police Department (the "NYPD"), the non-profit organization Children's Village and two of its employees, and an Assistant District Attorney — had violated Plaintiffs' constitutional rights.  At this point in the proceedings, only two defendants remain:  ACS Caseworker Beverly Wilson and NYPD Officer Kyle Hurst (together, "Defendants").  C.S. asserts claims for malicious prosecution

---

[1]     Plaintiff C.S. was a minor at the time of the relevant events.  Therefore, the Court will refer to him by his initials.

and denial of his right to a fair trial against Hurst, in connection with a criminal prosecution of C.S. in April 2014.  Mortimer asserts that Wilson violated her right to procedural due process by failing to give her sufficient notice of an August 1, 2014 court proceeding that resulted in a temporary removal order placing C.S. in non-kinship foster care.

Before the Court now is Hurst's motion for summary judgment against C.S.'s claims for malicious prosecution and denial of a right to a fair trial, and Wilson's motion for partial summary judgment against Mortimer's application for compensatory damages as part of her procedural due process claim.  For the reasons that follow, Hurst's motion is granted in full and Wilson's motion is denied.

## BACKGROUND[2]

### A.    Factual Background

While connected, C.S.'s and Mortimer's claims are temporally and

---

[2]    In resolving Hurst's motion for summary judgment, the Court draws facts from Hurst's Rule 56.1 Statement of Material Facts Not in Dispute ("Hurst 56.1" (Dkt. #223)), C.S.'s Rule 56.1(b) Counterstatement of Disputed Material Facts ("C.S. 56.1" (Dkt. #245)), and Hurst's Reply to C.S.'s Counterstatement of Disputed Material Facts ("Hurst Reply 56.1 (Dkt. #249).  In resolving Wilson's motion for partial summary judgment, the Court draws facts from Wilson's Rule 56.1 Statement of Material Facts Not in Dispute ("Wilson 56.1" (Dkt. #228)), Mortimer's Rule 56.1 Counterstatement of Disputed Material Facts ("Mortimer 56.1" (Dkt. #241)), and Wilson's Reply to Mortimer's Counterstatement of Disputed Material Facts ("Wilson Reply 56.1" (Dkt. #253)).  Citations to the parties' Rule 56.1 Statements incorporate by reference the documents and deposition testimony cited therein.  *See* Local Rule 56.1(d).

For ease of reference, Hurst's opening brief will be referred to as "Hurst Br." (Dkt. #225), and his reply brief as "Hurst Reply" (Dkt. #251).  C.S. filed a Declaration in Opposition to Hurst's Motion for Summary Judgment, which will be referred to as "C.S. Decl." (Dkt. #243), and an Affidavit Presenting Objections to Hurst's Statement of Facts, which will be referred to as "C.S. Aff." (Dkt. #246).  Wilson's opening brief will be referred to as "Wilson Br." (Dkt. #231); Mortimer's opposition brief as "Mortimer Opp." (Dkt. #242); and Wilson's reply brief as "Wilson Reply" (Dkt. #255).  Citations to sworn statements will be referred to using the convention "[Name] Decl.," and citations to depositions will be referred to using the convention "[Name] Dep."

analytically distinct:  C.S.'s claims relate to his arrest and prosecution in April 2014, while Mortimer's claim concerns a hearing in Family Court held on August 1, 2014.  The Court presents the relevant facts in two sections, separated according to the motion to which the facts pertain.

### 1.    The April 12, 2014 Incident, and C.S.'s Arrest and Criminal Prosecution

In April 2014, C.S. was residing with his mother, Kim Mortimer, in an apartment in New York City.  (C.S. 56.1 ¶¶ 1-2).  C.S. and Mortimer had a tumultuous relationship, and in consequence C.S. spent some nights with his grandmother, who lived nearby.  (*Id.* at ¶¶ 3-4).  On April 12, 2014, between the hours of 2:00 a.m. and 3:00 a.m., C.S. arrived at Mortimer's apartment building to gather some of his belongings so that he could stay the night with his grandmother.  (*Id.* at ¶¶ 1-2).  Mortimer was upset with C.S. for arriving home after his 8:30 p.m. curfew.  (*Id.* at ¶ 6).  Mortimer permitted C.S. to enter the apartment building, but refused to allow him to enter the apartment itself. (*Id.* at ¶ 7).  An altercation ensued between Mortimer and C.S. in the doorway of the apartment, with Mortimer attempting to physically block C.S.'s entry. (*Id.* at ¶¶ 8-9).  C.S. pushed and shoved Mortimer to get her out of his way, and attempted to enter the apartment by ducking underneath her arms.  (*Id.* at ¶¶ 10-11).  Mortimer attempted to close the door on C.S. and tried to tackle him so that he could not enter the apartment.  (*Id.* at ¶¶ 12-13).

Eventually, C.S. got past Mortimer and entered the apartment.  (C.S. 56.1 ¶ 14).  Once inside, C.S. grabbed a pair of metal hammer pliers.  (*Id.* at ¶ 15).  Mortimer later stated that C.S. grabbed the pliers to use on her if she

got in his way, though C.S. said he intended to use the pliers in a purely
defensive manner. (*Id.*; Weiner Decl., Ex. C at 3). At some point, Mortimer was
able to wrest the pliers from C.S. (C.S. 56.1 ¶ 17). Eventually, C.S. gathered
his belongings and attempted to leave the apartment building. (*Id.* at ¶¶ 18-
19).

C.S. and Hurst disagree over what happened next, but as will be made
clear later in this Opinion, what actually transpired is not material to the
resolution of Hurst's motion. In brief, Mortimer attempted to stop C.S. from
leaving the apartment. (C.S. 56.1 ¶ 19). In the process, a door to the
apartment building was slammed on Mortimer's finger, lacerating her finger
and causing it to bleed. (*Id.* at ¶¶ 19-21). Mortimer then ran out of the
apartment building, with C.S. chasing after her. (*Id.* at ¶¶ 22-23). Mortimer
ran to a nearby apartment building and told a building security guard to call
the police. (*Id.* at ¶ 26). The security guard called the police, and shortly
thereafter Hurst arrived with a fellow NYPD officer, Joseph Burrowes. (*Id.* at
¶¶ 27-28). The police spoke with Mortimer and C.S. separately, and observed
that Mortimer was bleeding. (*Id.* at ¶¶ 29-30). C.S. was then arrested, and
Mortimer was taken to a nearby hospital for treatment for her finger, which
required stitches. (*Id.* at ¶¶ 32-34).

At the hospital, Mortimer spoke with Hurst and Burrowes about the
incident. (C.S. 56.1 ¶¶ 35-36). Afterwards, Mortimer drafted and signed a
sworn "Statement of Allegations/Supporting Deposition," in which she wrote:

> [C.S] came back several hours past his curfew @ 2:58
> a.m. His curfew was 8:30 p.m. He attempted to push

> past me, demanding that he get his belongings.  We
> got into an altercation and he barged through and
> went to get a pair of hammer pliers to use on me if I
> got in his way.  I attempted to stop him from leaving in
> the process closed the door upon my finger and ran
> into my friend's house to get away from him.

(*Id.* at ¶¶ 37-38).  After the phrase "stop him from leaving," Mortimer had

written and crossed out the word "again."  (Weiner Decl., Ex. C at 3).  Between

the words "process" and "closed" she wrote several letters that are

indecipherable, and then crossed them out.  (*Id.*).  Mortimer later testified that

during this interaction with Hurst, she informed him that she had pulled the

door shut on her own finger, and that he (Hurst) seemed disappointed by this.

(Weiner Decl., Ex. A ("Mortimer Dep.") 91:4-11).

Meanwhile, C.S. was transported to a NYPD precinct, where he was

interviewed by Assistant District Attorney Timothy Duda (the "ADA") while

Hurst was present.  (C.S. 56.1 ¶¶ 39-43).  C.S. recounted the incident to the

ADA and Hurst, and provided certain background information, including that

C.S. had previously defended himself against Mortimer's physical attacks.  (*Id.*

at ¶ 44).  C.S. told the ADA and Hurst that he grabbed the pliers in case

Mortimer began attacking him.  (Hurst Reply 56.1 ¶ 55).  C.S. also said that as

Mortimer fled from the apartment building, she screamed: "I'm bleeding and

this guy has injured me."  (C.S. 56.1 ¶ 44).  C.S. claimed not to know how

Mortimer had been injured, and speculated that she may have cut herself with

the pliers.  (*Id.*; Hurst Reply 56.1 ¶ 58).

Plaintiff was arraigned in New York County Criminal Court on charges of:

(i) assault in the third degree, in violation of New York Penal Law § 120.00(2);

(ii) menacing in the second degree, in violation of New York Penal Law
§ 120.14(1); (iii) aggravated harassment in the second degree, in violation of
New York Penal Law § 240.30(4); (iv) criminal possession of a weapon in the
fourth degree, in violation of New York Penal Law § 265.01(2); (v) menacing in
the third degree, in violation of New York Penal Law § 120.15; (vi) attempted
assault in the third degree, in violation of New York Penal Law §§ 110 and
120.00; and (vii) harassment in the second degree, in violation of New York
Penal Law § 240.26(1) (together, the "Criminal Charges").  (C.S. 56.1 ¶ 46).  The
criminal court complaint included a sworn statement by Officer Hurst that
stated in relevant part:

> I am informed by Kim Mortimer … that she observed
> the defendant use his hands to shove her and grab
> her.  I am further informed by Ms. Mortimer that
> during the struggle a door was slammed shut on her
> hand causing a deep laceration to her left index finger
> which required stitches as well as substantial pain.  I
> am further informed by Ms. Mortimer that she then
> observed the defendant pick up a pair of pliers and
> hold them in front of him while stating in substance "I
> will hurt you if you don't get out of my way," thereby
> placing her in fear of her physical safety.

(*Id.* at ¶ 47).  At the arraignment, an order of protection was issued (the "Order
of Protection"), requiring C.S. to stay away from Mortimer.  (*Id.* at ¶ 48).  C.S.
was released on his own recognizance after the arraignment.  (*Id.* at ¶ 49).  C.S.
does not recall if he was required to appear in court after the arraignment
hearing (*id.* at ¶ 53), but claims to have received a mandatory curfew of 8:00
p.m. for the remainder of the summer of 2014 (C.S. Decl. 9).

On July 14, 2014, the Criminal Charges against C.S. were dismissed. (C.S. 56.1 ¶ 50).  The criminal court docket sheet states that the charges were dismissed upon motion of the district attorney because the "People cannot prove [guilt] beyond a reasonable doubt."  (*Id.* at ¶ 52).  Mortimer testified that the charges were dismissed because she would not testify in any criminal proceeding against C.S.  (*Id.* at ¶ 51).

## 2. Mortimer's Notice of the August 1, 2014 Proceeding

Sometime after C.S. was arrested in April 2014, Wilson, a child protective specialist working for ACS, was assigned to investigate allegations of child abuse against Mortimer.  (Mortimer 56.1 ¶ 2).  Wilson met with C.S. without Mortimer's knowledge or consent on April 14, May 24, June 5, June 18, and July 23, 2014.  (Mortimer Decl. 3-4).  Wilson also attempted to have family meetings with Mortimer and C.S., but Mortimer informed Wilson that such meetings would be impossible given the Order of Protection.  (*Id.*).

On July 23, 2014, another domestic dispute occurred between Mortimer and C.S. that resulted in the police responding to Mortimer's apartment. (Mortimer 56.1 ¶ 3).[3]  Mortimer subsequently agreed that C.S. should stay with his grandmother for some time.  (*Id.*).  On July 23, 2014, C.S. began staying with his grandmother.  (*Id.* at ¶ 4).  On August 1, 2014, ACS filed a "Petition Neglect Case," setting forth the basis for ACS's finding that Mortimer had neglected C.S. and seeking his temporary removal from Mortimer's home.

---

[3]     The criminal proceeding that had given rise to the Order of Protection had been dismissed on July 14, 2014, before the July 23, 2014 altercation occurred.  But the record does not make clear whether the Order of Protection had been formally terminated before July 23, 2014.

(Wilson 56.1 Reply ¶ 48).  On August 1, 2014, a hearing regarding the Petition was held in Family Court (the "August 1, 2014 Proceeding"), at which the judge ordered the temporary removal of C.S. into non-kinship foster care (the "Temporary Removal Order").  (Mortimer 56.1 ¶ 5).  The parties dispute whether Wilson provided Mortimer with notice of the August 1, 2014 Proceeding before it was held.  (Wilson 56.1 Reply ¶ 49).[4]

## B.   Procedural Background

Plaintiffs initiated this action on September 11, 2015, and, since then, have thrice amended their pleadings.  (Dkt. #1, 29, 53, 93).  The Third Amended Complaint, the operative pleading, was filed on May 1, 2017. (Dkt. #93).  Those defendants named in the Third Amended Complaint filed motions to dismiss that were fully briefed as of October 10, 2017.  (Dkt. #133, 135, 138, 140).  On March 29, 2018, the Court issued an Opinion and Order dismissing all of Plaintiffs' claims save three: (i) C.S.'s claim of malicious prosecution against Hurst; (ii) C.S.'s claim of denial of a right to a fair trial against Hurst; and (iii) Mortimer's procedural due process violation claim against Wilson. (Dkt. #141).  *See Mortimer* v. *City of N.Y.*, No. 15 Civ. 7186 (KPF), 2018 WL 1605982 (S.D.N.Y. Mar. 29, 2018) ("*Mortimer I*").

---

[4]    Although not material to the resolution of the instant motions, the Court briefly recounts the events that followed the August 1, 2014 Proceeding, and which were at the center of Mortimer's and Hurst's claims brought against defendants that have since been dismissed.  *Mortimer* v. *City of N.Y.*, No. 15 Civ. 7186 (KPF), 2018 WL 1605982 (S.D.N.Y. Mar. 29, 2018).  After the Temporary Removal Order was entered, C.S. was placed in foster care in New York State.  *Id.* at *6-7.  On August 30, 2014, C.S. left foster care and absconded to Germany.  *Id.*  Mortimer claimed that, after C.S. fled foster care, caseworkers from the Children's Village began to harass her and enter her home without her permission.  *Id.* at *7.  On September 2, 2014, the Family Court issued a warrant for C.S.'s arrest.  *Id.*  Mortimer claims that on September 16, 2014, the Department of Homeland Security learned that C.S. had flown to Germany, and that she was arrested pursuant to the warrant for C.S.'s arrest the next day.  *Id.*

On December 5, 2019, Defendants sought leave to file motions for summary judgment against Plaintiffs. (Dkt. #219). The Court granted Defendants' applications and set a briefing schedule for their anticipated motions on December 6, 2019. (Dkt. #220). Hurst filed his motion for summary judgment on January 24, 2020. (Dkt. #222-226). Wilson filed her motion for partial summary judgment that same day. (Dkt. #227-231). Mortimer filed her opposition papers on May 4, 2020. (Dkt. # 240-242). C.S. filed his opposition papers on May 7, 2020. (Dkt. #243, 245, 246). Hurst filed his reply papers on May 29, 2020. (Dkt. #249-251). Wilson filed her reply papers that same day, rendering both motions fully briefed and ripe for review. (Dkt. #253-255).

## DISCUSSION

### A.   Applicable Law

#### 1.   Motions for Summary Judgment Under Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[5] A fact is "material" if it "might affect the outcome of the suit under the

---

[5]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  In determining whether there are genuine issues of material fact, courts are "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry* v. *Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quotation omitted).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *CILP Assocs., L.P.* v. *PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (internal quotation marks and alteration omitted).  But where "the burden of proof at trial would fall on the nonmoving party," the moving party can shift the initial burden by "point[ing] to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Simsbury-Avon Pres. Soc'y, LLC* v. *Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).  If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citations and quotation marks omitted).  The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a

motion for summary judgment." *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

In deciding a motion for summary judgment, "a district court generally 'should not weigh evidence or assess the credibility of witnesses.'" *Rojas* v. *Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Hayes* v. *N.Y.C Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)).  But to that general rule, the Second Circuit has recognized an exception:

> in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.

*Jeffreys*, 426 F.3d at 554 (internal citation omitted) (quoting *Anderson*, 477 U.S. at 252).  In this rare setting, a court considering a summary judgment motion may make credibility determinations.  *SEC* v. *Jankovic*, No. 15 Civ. 1248 (KPF), 2017 WL 1067788, at *8 (S.D.N.Y. Mar. 21, 2017).  Even then, the Second Circuit has cautioned that, "[i]f there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Jeffreys*, 426 F.3d at 555 n.2 (emphasis and citation omitted).  Instead, such credibility assessments are to be reserved for "extraordinary cases, where the facts alleged are so contradictory that doubt is cast upon their plausibility." *Rojas*, 660 F.3d at 106 (citation and quotation marks omitted).  A district court "must ask not

whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Simpson* v. *City of N.Y.*, 793 F.3d 259, 265 (2d Cir. 2015).

### 2. Motions for Summary Judgment in *Pro Se* Cases

In a *pro se* case, the court must take an additional step and liberally construe the *pro se* party's pleadings "to raise the strongest arguments that they suggest."  *McPherson* v. *Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos* v. *Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

This task has been complicated by Plaintiffs' imperfect compliance with Local Rule 56.1.  Under that rule, a movant is required to identify admissible evidence in support of each factual assertion in his or her Rule 56.1 statement. *See* S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant … pursuant to Rule 56.1(a) … must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").  Conversely, a nonmovant seeking to controvert these factual assertions must also cite to admissible evidence, and where properly supported facts in a Local Rule 56.1 statement are denied with only conclusory assertions, the court will find such facts to be true.  *See id.*; *id.* at 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

Both Plaintiffs have filed specific objections in response to Defendants' 56.1 Statement.  But Plaintiffs' Rule 56.1 Counterstatements frequently cite to pieces of evidence not provided to the Court with *any* party's motion papers. Where Plaintiffs' objections are unsupported by the record, they are conclusory and cannot create a genuine dispute of material fact.  "*Pro se* litigants are ... not excused from meeting the requirements of Local Rule 56.1."  *Wali* v. *One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (citing *Vt. Teddy Bear*, 373 F.3d at 246).  Nevertheless, even where there is incomplete compliance with the Local Rules, a court retains discretion "to consider the substance of the plaintiff's arguments."  *Id.* (citing *Holtz* v. *Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." (internal quotation marks omitted))); *see also Hayes* v. *Cty. of Sullivan*, 853 F. Supp. 2d 400, 406 n.1 (S.D.N.Y. 2012) ("In light of Plaintiff's *pro se* status, the Court overlooks his failure to file a Local Rule 56.1 Statement and conducts its own independent review of the record."). To be fair to all parties, the Court will rely principally on its own assiduous review of the record.

## B.    Analysis

As noted, each Defendant's motion for summary judgment is aimed at claims raised by a particular Plaintiff.  Hurst argues that summary judgment should be granted against C.S.'s remaining claims of malicious prosecution

and denial of the right to a fair trial.  (*See generally* Hurst Br.).  Wilson argues that summary judgment should be granted against Mortimer's procedural due process claim, but only insofar as Mortimer seeks compensatory damages. (*See generally* Wilson Br.).  The Court begins with Hurst's motion, because it involves events that occurred earlier in time.

### 1.   The Court Grants Hurst's Motion for Summary Judgment

At base, C.S. argues that Hurst violated his constitutional rights by engaging in malicious prosecution and denying C.S. the right to a fair trial, because the Criminal Charges filed against C.S. were the result of Hurst's fabrication of evidence and misleading of the ADA who filed those charges.  The Court addresses the viability of each claim in turn, ultimately concluding that summary judgment is warranted as to both.

### a.   Summary Judgment Is Warranted as to C.S.'s Malicious Prosecution Claim

The Second Circuit recently reaffirmed the elements of a malicious prosecution claim brought under 42 U.S.C. § 1983:

> "[A] plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello* v. *City of N.Y.*, 612 F.3d 149, 160-61 (2d Cir. 2010) (internal citations omitted).  New York law requires a plaintiff to demonstrate that "[i] the defendant initiated a prosecution against plaintiff, [ii] without probable cause to believe the proceeding can succeed, [iii] the proceeding was begun with malice[,] and[ ] [iv] the matter terminated in plaintiff's favor." *Rentas* v. *Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016) (internal quotation marks omitted). Further, "[i]n order to allege a cause of action for malicious prosecution under § 1983, [the plaintiff] must assert, in addition to the elements

> of malicious prosecution under state law, that there
> was [v] a sufficient post-arraignment liberty restraint
> to implicate the plaintiff's Fourth Amendment
> rights." *Rohman* v. *N.Y.C. Transit Auth.*, 215 F.3d 208,
> 215 (2d Cir. 2000) (emphasis omitted).

*Azeez* v. *City of N.Y.*, 790 F. App'x 270, 273 (2d Cir. 2019) (summary order).

New York's "tort law serves only as a source of persuasive authority rather than

binding precedent in defining" the first four of these five elements. *Lanning* v.

*City of Glens Falls,* 908 F.3d 19, 25 (2d Cir. 2018).

Hurst argues that C.S. has failed to establish that any of these five

elements was met. (Hurst Br. 7-16). And even if his involvement in the filing of

the Criminal Charges infringed upon C.S.'s Fourth Amendment rights, Hurst

claims that he is entitled to qualified immunity. (Hurst Br. 16-19). C.S.

generally argues that his malicious prosecution claim should survive summary

judgment but, as is explored in greater detail below, concedes that certain of

the Criminal Charges are not adequate bases on which to predicate a claim of

malicious prosecution. (*See generally* C.S. Decl.; C.S. Aff. 2 ("There was not

'probable cause' for ALL of the criminal charges against Plaintiff, only some of

them.")).

In evaluating this portion of Hurst's motion, the Court must determine

whether Hurst's role in the filing of any one of the Criminal Charges against

C.S. constituted malicious prosecution. *See Coleman* v. *City of N.Y.*, 688 F.

App'x 56, 58 (2d Cir. 2017) (summary order). Because this determination

hinges in part upon the elements of the crimes charged, the Court outlines

those elements before delving into the analysis.

To assist in that analysis, the Court divides the Criminal Charges into two categories.  The first category includes those three crimes that allege that the accused (here, C.S.) injured or attempted to injure another person, and will be referred to herein as the "Injury-Based Charges":

(i)     Assault in the third degree, which occurs when "[a] person … recklessly causes physical injury to another person[.]" N.Y. Penal Law § 120.00(2);

(ii)    Attempted assault in the third degree, which occurs when a person "attempts to recklessly cause physical injury to another person[.]" N.Y. Penal Law §§ 110/120.00; and

(iii)   Aggravated harassment in the second degree, which occurs when a person "strikes, shoves, kicks[,] or otherwise subjects another person to physical contact thereby causing physical injury to such person or to a family or household member … [w]ith the intent to harass, annoy, threaten[,] or alarm another person[.]" N.Y. Penal Law § 240.30(4).

The remaining four Criminal Charges do not allege that C.S. injured or attempted to injure another person, and will be referred to herein as the "Non-Injury-Based Charges":

(iv)    Menacing in the second degree, which occurs when "[a] person … intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury[,] or death by displaying a deadly weapon, dangerous instrument[,] or what appears to be a pistol, revolver, rifle, shotgun, machine gun[,] or other firearm[.]" N.Y. Penal Law § 120.14(1);

(v)     Criminal possession of a weapon in the fourth degree, which occurs when "[a] person … possesses any dagger, dangerous knife, dirk, razor, stiletto, imitation pistol, or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another[.]" N.Y. Penal Law § 265.01(2);

(vi)     Menacing in the third degree, which occurs when "[a]
person … by physical menace … intentionally places
or attempts to place another person in fear of death,
imminent serious physical injury[,] or physical injury."
N.Y. Penal Law § 120.15;

(vii)    Harassment in the second degree, which occurs when
"[a] person … with intent to harass, annoy or alarm
another person … strikes, shoves, kicks[,] or otherwise
subjects such other person to physical contact, or
attempts or threatens to do the same."  N.Y. Penal Law
§ 240.26(1).[6]

### i.     A Genuine Dispute Exists as to Whether Hurst Initiated the Injury-Based Charges

While criminal charges are brought by prosecutors, a police officer can

be said to have initiated a criminal proceeding "by filing charges or other

accusatory instruments," *Minott* v. *Duffy*, No. 11 Civ. 1217 (KPF), 2014 WL

1386583, at *15 (S.D.N.Y. April 8, 2014) (quoting *Cameron* v. *City of N.Y.*, 598

F.3d 50, 63 (2d Cir. 2010)), or where the "officer is found to play[ ] an active

role in the prosecution, such as giving advice and encouragement or

importuning the authorities to act," *Bermudez* v. *City of N.Y.*, 790 F.3d 368,

377 (2d Cir. 2015) (internal quotation marks and citation omitted).  New York

law presumes that a prosecutor exercises independent judgment.  *Minott*, 2014

WL 1386583, at *16.  Thus, "when a plaintiff pursues a claim of malicious

prosecution against police officers based on an 'unlawful arrest,' the

'intervening exercise of independent judgment' by a prosecutor to pursue the

case usually breaks the 'chain of causation' unless the plaintiff can produce

---

[6]     The Court does not categorize harassment in the second degree as an Injury-Based
Charge because, though it involves violence, it does not require that the accused cause
or attempt to cause injury.

evidence that the prosecutor was 'misled or pressured' by the police." *Dufort* v. *City of N.Y.*, 874 F.3d 338, 352 (2d Cir. 2017) (quoting *Townes* v. *City of N.Y.*, 176 F.3d 138, 147 (2d Cir. 1999)).

Hurst was a police officer, and thus did not actually bring the Criminal Charges against C.S.  Furthermore, the ADA who did bring the charges interviewed C.S. before bringing the charges.  (C.S. 56.1 ¶¶ 42-43).  This would serve to break the chain of causation between Hurst and the Criminal Charges, unless Hurst misled or pressured the prosecutor into bringing those charges. C.S. has not suggested that Hurst pressured the ADA to take any action against him.  And the record reflects that Hurst made only a single representation that could have conceivably misled or pressured the prosecutor: Hurst's sworn statement in the criminal complaint, in which Hurst purported to relay information provided by Mortimer in his interview with her.  (Weiner Decl., Ex. G).  In that document, Hurst stated that Mortimer claimed that: (i) C.S. had used his hands to shove her and grab her; (ii) Mortimer's finger was lacerated when a door slammed shut on her finger during her struggle with C.S.; and (iii) C.S. placed Mortimer in fear for her physical safety when he picked up a pair of pliers and stated in substance that he would hurt her if she did not get out of his way.  (*Id.*).

C.S. does not argue that Hurst misled the prosecutor when he wrote that Mortimer said that C.S. pushed and shoved her.  (*See generally* C.S. Aff.; C.S. Decl.).  Nor could he; Mortimer's written statement to the police related that C.S. had tried to push past her to enter the apartment, and Mortimer has

consistently testified that C.S. in fact pushed and shoved her.  (C.S. 56.1 ¶ 10).
Similarly, C.S. does not challenge whether Mortimer said that C.S. picked up a
pair of pliers to use on her if she got in his way.  (*See generally* C.S. Aff.; C.S.
Decl.).  Such a challenge, if presented, would also have failed; Mortimer's
written statement mirrors Hurst's sworn statement in the criminal complaint.
(C.S. 56.1 ¶ 38).

Instead, C.S. claims that Hurst misled the prosecutor with respect to the
manner in which Mortimer's finger was injured.  (C.S. Aff. 3-5).  Hurst's sworn
statement recited that "during the struggle [with C.S.] a door was slammed
shut on [Mortimer's] hand causing a deep laceration to her left index finger
which required stitches as well as substantial pain."  (Weiner Decl., Ex. G).
This statement is ambiguous as to who caused the door to slam on Mortimer's
finger.  The ambiguity in this statement echoes that in Mortimer's own written
statement to the police, in which she said that "I attempted to stop him from
leaving in the process closed the door upon my finger and ran into my friend[']s
house to get away from him."  (C.S. 56.1 ¶¶ 37-38).  Without a noun or
pronoun before the word "closed," the sentence is ambiguous as to who closed
the door on Mortimer's finger.  If Mortimer's written statement were the only
communication between Hurst and Mortimer on that topic, it could hardly be
said that Hurst's statement was misleading to the prosecutors.

But construing the facts in the light most favorable to C.S., other
evidence suggests that, in speaking with Hurst at the hospital after the
incident, Mortimer clarified that she had closed the door on her finger.

(Mortimer Dep. 91:4-18; C.S. Aff. 3).  If credited by a jury, this testimony could establish that, before he provided his sworn statement in the criminal complaint, Hurst knew that Mortimer — not C.S. — was the cause of Mortimer's injury.  If this were true, Hurst's ambiguity on this point could be found to be misleading to the ADA who filed the Criminal Charges against C.S. "In sum, there are triable issues of fact concerning whether [the prosecutor's] decision to bring charges was tainted by misleading information[.]"  *Bermudez*, 790 F.3d at 376.

Ultimately, however, only the three Injury-Based Charges allege that C.S. caused or attempted to cause Mortimer injury.  To the extent that Hurst's statement may have been misleading, it would not have played any part in the prosecutor's decision to file the four Non-Injury-Based Charges.  It is true that certain of the Non-Injury-Based Charges accuse C.S. of possessing a dangerous weapon, and intending to use that weapon to injure another person.  *See supra* at 16-17.   And C.S. argues that these charges were unfounded, because (i) the pliers could not have constituted a dangerous weapon and (ii) he lacked the intent to use the weapons in any capacity aside from self-defense.  (C.S. Decl. 3; C.S. Aff. 1-2).  But the prosecutor who brought the charges was aware that C.S.'s weapon was a pair of pliers and that C.S. claimed he intended to use them only in self-defense — indeed, the prosecutor was present when C.S. made these representations.  (C.S. 56.1 ¶ 44; Weiner Decl., Ex. E).  Hurst could not be said to have misled the prosecutor with respect to these facts, nor has

C.S. plausibly established that Hurst committed any other misconduct.[7]  Thus, the prosecutor's decision to bring the Non-Injury-Based Charges would break any chain of causation between Hurst and the initiation of those charges.  *See Dufort*, 874 F.3d at 352.

In light of this, a genuine dispute exists concerning whether Hurst can be said to have initiated the Injury-Based Charges against C.S.  But no reasonable juror could find that Hurst initiated the Non-Injury-Based Charges.  Accordingly, summary judgment must be granted with respect to those four charges.

### ii.   A Genuine Dispute Exists as to Whether Hurst Had Probable Cause to Believe That C.S. Injured Mortimer

"Because lack of probable cause is an element of a malicious prosecution claim, 'the existence of probable cause is a complete defense to a claim of malicious prosecution.'"  *Stansbury* v. *Wertman,* 721 F.3d 84, 94-95 (2d Cir. 2013) (quoting *Manganiello,* 612 F.3d at 161-62).  "Probable cause, in the context of malicious prosecution, has [] been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty."  *Stansbury*, 721 F.3d at 95 (quoting *Boyd* v. *City of N.Y.,* 336 F.3d 72, 74, 77 (2d Cir. 2003)).  "Probable cause exists if a law enforcement

---

[7]     The Second Circuit has held that "[e]ven if the intervening decision-maker (such as a prosecutor, grand jury, or judge) is not misled or coerced, it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty."  *Higazy* v. *Templeton*, 505 F.3d 161, 177 (2d Cir. 2007) (quoting *Zahrey* v. *Coffey*, 221 F.3d 342, 352 (2d Cir. 2000)).  C.S. has not suggested that Hurst committed any misconduct, aside from misrepresenting the cause of Mortimer's injury.

officer 'received [] information from some person, normally the putative victim

or eyewitness, unless the circumstances raise doubt as to the person's veracity.

The reliability or veracity of the informant and the basis for the informant's

knowledge are two important factors." *Betts* v. *Shearman*, 751 F.3d 78, 82 (2d

Cir. 2014) (quoting *Panetta* v. *Crowley,* 460 F.3d 388, 395 (2d Cir. 2006)).  The

"defendant must have possessed probable cause as to each offense

charged." *Costello* v. *Milano,* 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014) (citations

omitted) (quoting *Savino* v. *City of N.Y.,* 331 F.3d 63, 72 (2d Cir. 2003)).

Just as a reasonable jury could find that Hurst misled the prosecutor

with respect to the cause of Mortimer's injury, the Court finds that a

reasonable jury could find that Hurst lacked probable cause to believe that

C.S. was guilty of one or more of the Injury-Based Charges.[8]  Hurst argues that

---

[8]     The Court notes that the existence of probable cause as to the Non-Injury-Based
Charges would conversely provide an independent basis to grant summary judgment in
Hurst's favor as to those charges.  C.S. himself acknowledged that probable cause
existed as to some of the charges.  (C.S. Aff. 2 ("There was not 'probable cause' for ALL
of the criminal charges against Plaintiff, only some of them.")).  Specifically, C.S. does
not argue that Hurst lacked probable cause to believe he was guilty of menacing in the
second degree, menacing in the third degree, or harassment in the second degree.  (*Id.*
at 5).

C.S.'s opposition papers can, however, be read to argue that Hurst lacked probable
cause to believe that he was guilty of criminal possession of a weapon in the fourth
degree.  (*See generally* C.S. Aff. 5).  C.S.'s argument is premised upon his purported
lack of intent to use the pliers as a weapon against Mortimer.  (*Id.* at 3).  C.S. claims
that he told Hurst that he intended to use the pliers only in self-defense, in the event
that Mortimer attacked him.  (*Id.*).  Placing to the side the issue of whether an intent to
use a weapon in self-defense would satisfy the intent requirement of criminal
possession of a weapon in the fourth degree, Hurst's belief concerning C.S.'s guilt was
driven by Mortimer's testimony that C.S. intended to use the pliers against her if she
got in his way.  (Weiner Decl., Ex. C at 3).  Mortimer's statement was sufficient to
provide probable cause, even if C.S.'s testimony may have contradicted her.  *See Wieder*
v. *City of N.Y.*, 569 F. App'x 28, 29 (2d Cir. 2014) (summary order) ("[W]e have found
probable cause where a police officer was presented with different stories from an
alleged victim and the arrestee." (quoting *Curley* v. *Vill. of Suffern,* 268 F.3d 65, 70 (2d
Cir. 2001)); *Ricciuti* v. *N.Y.C. Transit Auth.,* 124 F.3d 123, 128 (2d Cir. 1997) ("Once a
police officer has a reasonable basis for believing there is probable cause, he is not

he had probable cause to believe that C.S. caused Mortimer's injury, based on the existence of the injury, Mortimer's written statement, and C.S.'s own interview with the ADA, in which C.S. said that Mortimer had told the security guard that C.S. had injured her.  (Hurst Br. 11-12).  In isolation, these pieces of evidence would give Hurst reason to believe that C.S. injured Mortimer.  But Mortimer testified that she told Hurst before the Criminal Charges were filed that she had caused her own injury by accidentally slamming the door on her hand.  (Mortimer Dep. 91:4-18; C.S. Aff. 3).  If the jury were to credit this statement and consider it alongside C.S.'s own statement that he did not cause Mortimer's injury, it could find that Hurst lacked probable cause to believe C.S. caused the injury and, necessarily, that he lacked probable cause to believe that C.S. was guilty of the Injury-Based Charges.[9]

### iii.    A Genuine Dispute Exists as to Whether Hurst Acted with Malice

A criminal prosecution is commenced with malice when it is brought with "a wrong or improper motive, something other than a desire to see the ends of justice served." *Fulton* v. *Robinson*, 289 F.3d 188, 198 (2d Cir. 2002) (quoting *Lowth* v. *Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir. 1996)).  It is well settled in the Second Circuit that a jury may infer malice from the absence

---

required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.").

[9]    Nor would Mortimer's and C.S.'s testimony that C.S. pushed and shoved Mortimer to gain entry to the apartment support probable cause that C.S. attempted to cause her injury consistent with the crime of attempted assault in the third degree.  *See In re James T.*, 592 N.Y.S.2d 36, 37 (1st Dep't 1993) (finding that evidence that the accused hit an officer once in the shoulder was insufficient to show that he intended to cause physical impairment or substantial injury commensurate with attempted assault in the third degree).

of probable cause.  *See Ricciuti* v. *N.Y.C. Transit Auth.,* 124 F.3d 123, 128 (2d

Cir. 1997) ("[L]ack of probable cause generally raises an inference of malice

sufficient to withstand summary judgment.  In the present case ... a jury could

find that probable cause for the charges against the plaintiffs was lacking, and

that finding alone would support an inference of malice." (citation

omitted)); *Berry* v. *Marchinkowski*, 137 F. Supp. 3d 495, 535-36 (S.D.N.Y.

2015) ("[I]t is clear that, in the Second Circuit, a jury may infer malice from the

absence of probable cause.").  Consequently, where "the existence of probable

cause to prosecute remains in question, the existence of actual malice does as

well."  *Weiner* v. *McKeefery*, 90 F. Supp. 3d 17, 38 (E.D.N.Y. 2015).  Thus, the

Court finds that a reasonable jury could find that Hurst acted with malice in

initiating the Injury-Based Charges against C.S.

### iv.    A Genuine Dispute Exists as to Whether the Criminal Charges Were Terminated in C.S.'s Favor

In *Lanning* v. *City of Glen Falls*, the Second Circuit made clear that,

though a malicious prosecution claim brought under § 1983 and a malicious

prosecution claim under New York tort law both require that the termination of

the underlying criminal charges was favorable to the accused, the two causes

of action differ in how they define what constitutes a favorable termination.

908 F.3d 19, 24-29 (2d Cir. 2018).  Under New York tort law, dismissal of a

prosecution will "count as a favorable termination where the trial court's

reasons for dismissing the charges are 'not inconsistent with ... innocence.'"

*Lanning*, 908 F.3d at 27 (quoting *Cantalino* v. *Danner*, 96 N.Y.2d 391, 395

(2001)).  In a § 1983 action, however, "a plaintiff asserting a malicious

prosecution claim … must [] show that the underlying criminal proceeding ended in a manner that affirmatively indicates his innocence." *Lanning,* 908 F.3d at 22. "When a person has been arrested and indicted, absent an affirmative indication that the person is innocent of the offense charged, the government's failure to proceed does not necessarily 'impl[y] a lack of reasonable grounds for the prosecution.'" *Id.* at 28 (quoting *Conway* v. *Vill. of Mount Kisco,* 750 F.2d 205, 215 (2d Cir. 1984)). Indeed, where a dismissal "leaves the question of guilt or innocence unanswered … it cannot provide the favorable termination required" as the basis for a claim of malicious prosecution. *Id.* at 28-29 (quoting *Hygh* v. *Jacobs,* 961 F.2d 359, 368 (2d Cir. 1992) (internal quotations and alterations omitted)).

Hurst argues that dismissal of the Criminal Charges does not constitute a favorable termination, because it did not affirmatively indicate that C.S. was innocent. (Hurst Br. 15-16). The Court disagrees. The charges against C.S. were dismissed upon the motion of the ADA, and the docket sheet for C.S.'s criminal case recites the reason for dismissal as the "People cannot prove beyond a reasonable doubt." (C.S. 56.1 ¶¶ 50, 52). Thus, the record establishes that the termination of the charges was not due to some unknown "procedural or jurisdictional grounds … which [would] fail to affirmatively indicate [C.S.'s] innocence." *Lanning*, 908 F.3d at 28. Rather, the dismissal was because the prosecution determined that it would not be able to prove that C.S. was guilty of the charged crimes. Inasmuch as C.S. was entitled to the presumption of innocence unless and until convicted, the ADA's representation

that prosecutors lacked the evidence to prove C.S.'s guilt was tantamount to an admission that C.S. was innocent of the charged offenses: "[a]fter all, a lack of sufficient evidence in a criminal case entitles a defendant, as a matter of law, to a judgment of acquittal." *McKenzie* v. *City of N.Y.*, No. 17 Civ. 4899 (PAE), 2019 WL 3288267, at *15 (S.D.N.Y. July 22, 2019) (concluding that a jury could find that a decision by the prosecutor to drop a charge due to insufficient evidence constituted an admission that the accused was innocent).

Hurst argues that the charges were dropped because Mortimer "inexplicably" refused to testify, and that this "had no bearing on [C.S.'s] guilt or innocence." (C.S. Br. 15). But, interpreting the facts in the light most favorable to C.S., Mortimer's refusal to testify regarding the Injury-Based Charges was not inexplicable at all. During her deposition, Mortimer stated that she refused to provide testimony that C.S. caused her injury for the simple reason that such testimony would be inaccurate. (Mortimer Dep. 117:17-118:15). A reasonable jury could find that a dismissal premised upon the alleged victim and sole witness's belief that the accused had not done what he was charged with doing implies that the accused is innocent.

Further, the manner in which C.S.'s charges were terminated is readily distinguishable from that in the decisions on which Hurst relies — *Andrukiewicz* v. *City of N.Y.*, No. 18 Civ. 4206 (NGG) (RLM), Dkt. #22 (E.D.N.Y. Feb. 3, 2020), and *Smalls* v. *Collins*, No. 14 Civ. 326 (CBA) (RML), 2020 WL 2563393, at *7-8 (E.D.N.Y. Mar. 16, 2020) — which those courts found not to constitute favorable terminations. In *Andrukiewicz*, the charges against the

26

accused were dropped "due to lack of cooperation on the complainant's behalf." No. 18 Civ. 4206 (NGG) (RLM), Dkt. #22 at 7. The court found that dismissal of charges due to a non-cooperating witness did not affirmatively indicate the innocence of the accused. Here, however, the official reason for the dismissal was the insufficiency of the evidence, not the lack of cooperation from the complainant.

The fact pattern addressed in *Smalls* is, perhaps, more similar to that at issue here, in that the charges were dropped due to lack of evidence. 2020 WL 2563393, at *7-8. But the lack of evidence was due to the suppression of evidence, and the evidence was suppressed not because it lacked credibility, but because it had been obtained improperly. Though the suppression of evidence resulted in the dismissal of charges, the court in *Smalls* found that the dismissal did not indicate the innocence of the accused, because the suppressed evidence would have demonstrated his guilt. *Id.* In direct contrast to the termination of charges in *Smalls*, a deeper dive into the sufficiency *vel non* of the evidence against C.S. reveals that the Injury-Based Charges failed not on a technicality, but due to a dearth of evidence that C.S. caused Mortimer's injury. Mortimer's deposition testimony indicated that she was not merely refusing to cooperate with the prosecution, but that she believed the prosecution's charges did not comport with what C.S. had done. In this way, the case at hand is much more analogous to *Blount* v. *City of N.Y.*, No. 15 Civ. 599 (PKC) (JO), 2019 WL 1050994, at *2 (E.D.N.Y. Mar. 5, 2019), where evidence was suppressed due in part to its lack of credibility, and the court

found that the resulting termination of a prosecution affirmatively indicated the accused's innocence.

For these reasons, a reasonable jury could find that the circumstances of the prosecution's dismissal of the Criminal Charges against C.S. affirmatively indicated his innocence. At the very least, a genuine dispute exists as to whether dismissal of the Injury-Based Charges resulted in a termination favorable to C.S.

> **v.      C.S. Was Not Subjected to a Sufficient Post-Arraignment Liberty Restraint as a Matter of Law**

To review, the Court has found triable issues on the first four elements of a § 1983 malicious prosecution claim — those that are analogous to the elements of malicious prosecution under New York tort law. Significantly, however,

> [a] plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must [also] show some deprivation of liberty consistent with the concept of "seizure." This requirement is necessary to ensure that the § 1983 plaintiff has suffered a harm of constitutional proportions — *i.e.,* a harm cognizable under § 1983.

*Singer* v. *Fulton Cty. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995). It is the plaintiff's burden to show that the deprivation of liberty was the result of the allegedly malicious prosecution, and not some other charge that is supported by probable cause. *Coleman*, 688 F. App'x at 58; *see also Blue* v. *City of N.Y.*, No. 16 Civ. 9990 (VSB), 2018 WL 2561023, at 6-7 (S.D.N.Y. June 4, 2018) ("If, however, the court appearances are attributable to other pending criminal

charges against the plaintiff, court appearances are not sufficient to make out the necessary post-arraignment deprivation of liberty.").

Hurst argues that C.S. did not suffer a post-arraignment deprivation of liberty sufficient to support a Fourth Amendment malicious prosecution claim. (Hurst Br. 16 (citing *Burg* v. *Gosselin*, 591 F.3d 95, 101 (2d Cir. 2010) ("[A] pre-arraignment, nonfelony summons requiring no more than a later court appearance does not constitute a Fourth Amendment seizure.").  The record reflects that the filing of the Criminal Charges resulted in two developments that might be construed as depriving C.S. of liberty:  (i) he was required to attend an arraignment hearing; and (ii) the state court judge before whom C.S. was arraigned entered the Order of Protection, which required C.S. to stay away from Mortimer and her house and to refrain from contacting her.  (C.S. 56.1 ¶¶ 46, 48).  C.S. argues that he was also forced to abide by an 8:00 p.m. curfew for the remainder of the summer of 2014, a violation of which would have "sent [him] straight to prison."  (C.S. Aff. 6).

As an initial matter, C.S.'s arraignment on the Criminal Charges cannot satisfy the deprivation of liberty element; the Second Circuit has been clear that a single court appearance at an arraignment does not amount to a deprivation of liberty that will support a malicious prosecution claim.  *Singer*, 63 F.3d at 117 ("[A]ny post-arraignment deprivations of liberty (such as being bound-over for trial) might satisfy this constitutional requirement."); *Burg*, 591 F.3d at 98 ("[T]he issuance of a pre-arraignment, non-felony summons requiring a later court appearance, without further restrictions, does not

constitute a Fourth Amendment seizure.  This summons does no more than require Burg to appear in court on a single occasion, and operates to effectuate due process.").  Nor is the element met by C.S.'s bare allegation that he was subjected to a curfew.  The Court will accept C.S.'s claim as true, because it was presented in a sworn affidavit.  *Davis* v. *New York*, 316 F.3d 93, 100 (2d Cir. 2002).  Even so, C.S. did not testify that the curfew was imposed as a result of the Criminal Charges.  Thus, there is no record evidence to tie the curfew to Hurst's alleged misconduct, nor is there any suggestion that Hurst caused the curfew.  *See Brown* v. *Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (noting that if the non-moving party would bear the burden of proof at trial, they "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" to survive summary judgment).

There remains the Order of Protection, which the Court finds would constitute a deprivation of liberty.  The Second Circuit has held that "the liberty deprivations regulated by the Fourth Amendment are not limited to physical detention."  *Murphy* v. *Lynn*, 118 F.3d 938, 945 (2d Cir. 1997).  Indeed, in *Murphy*, the Second Circuit held that, though the defendant had been released post-arraignment, an order requiring him not to leave the state constituted a seizure within the meaning of the Fourth Amendment.  *See id.*; *see also Burg*, 591 F.3d at 98 (reaffirming the holding of *Murphy*).  It is also well established in this Circuit that "children have a [] constitutionally protected liberty interest in not being dislocated from the 'emotional attachments that derive from the intimacy of daily family association."  *Kia P.* v.

*McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000) (quoting *Duchesne* v.

*Sugarman,* 566 F.2d 817, 825 (2d Cir. 1977)); *see also Southerland* v. *City of*

*N.Y.,* 680 F.3d 127, 142 (2d Cir. 2012) (holding that children have a liberty

interest in not being separated from their parents and, therefore, "[t]he state's

removal of a child from his or her parent may []give rise to a variety of

cognizable constitutional claims").  The Order of Protection, which required

C.S. — then a minor — to stay away from and refrain from communicating with

his mother, could constitute a deprivation of liberty and a "harm of

constitutional proportions."  *Singer*, 63 F.3d at 116.[10]

Even so, the Order of Protection would support C.S.'s malicious

prosecution claim only if it "resulted from" the charges that were the fruits of

Hurst's allegedly violative conduct.  *See Coleman*, 688 F. App'x at 58; *see also*

*Murphy*, 118 F.3d at 944.  On this point, the Second Circuit's recent non-

precedential decisions in *Coleman* and *Carvalho* v. *City of N.Y.*, 732 F. App'x 18,

24 (2d Cir. 2018) (summary order), are instructive.  In *Coleman*, the Second

Circuit addressed a situation in which a plaintiff brought a claim for malicious

prosecution after he was charged with committing various crimes, including

assault, and was required to appear in court more than a dozen times.  688 F.

App'x at 58.  Eventually the trial court determined that probable cause existed

---

[10]     Hurst cites *Lacey* v. *Yates County*, 30 F. Supp.3d 213, 226 (W.D.N.Y. 2014), for the
proposition that orders of protection do not constitute a deprivation of liberty under the
Fourth Amendment.  But this considerably overstates the court's decision in *Lacey*.
There, the court found that the mere allegation that a temporary order of protection had
been imposed would not support a claim that the plaintiff suffered a deprivation of
liberty, because no allegations were made as to what restrictions the order placed on
the plaintiff or what role the defendants played in its issuance.  *Id.*  Here, in contrast,
the Court has been provided with the text of the Order of Protection itself and can
evaluate whether it deprived C.S. of a protected liberty.

for all of the criminal charges, except the charge of assault.  *Id.*  The Second Circuit held that, even if the court appearances constituted a deprivation of liberty, such deprivation was "not solely attributable to the assault charges, which are the only remaining charges for which [the plaintiff] could have a malicious prosecution claim.  Even if the assault charges had never been, [the plaintiff] still would have had the obligation to appear on account of the other criminal charges."  *Id.*  Thus, the plaintiff had not met his burden of showing the post-arraignment deprivation of liberty resulted from an allegedly malicious prosecution.  *Id.*

The Second Circuit addressed a similar factual scenario in *Carvalho*, except the plaintiffs there brought a claim for violation of their right to a fair trial based on fabricated evidence, not malicious prosecution.  732 F. App'x 18. The two claims are similar in that both require the plaintiff to show that he or she suffered a deprivation of "life, liberty, or property" as a result of the alleged misconduct.  *See Garnett* v. *Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016).[11]  The Second Circuit found that the plaintiffs in *Carvalho* could not satisfy this element, because they had failed to adduce any evidence that the detention they suffered was the result of the allegedly fabricated evidence and not the plaintiff's arrest for disorderly conduct, which was supported by probable cause.  732 F. App'x at 24.

---

[11]    The Court notes that, though probable cause is a complete defense to a claim for malicious prosecution, the same is not true for a fair trial claim.  *Ganek* v. *Leibowitz*, 874 F.3d 73, 91 (2d Cir. 2017).  "If an arrest or prosecution were supported by probable cause, a plaintiff can still prevail on a fair trial claim if fabricated evidence causes some 'further deprivation.'"  *Collins* v. *City of N.Y.*, No. 14 Civ. 8815 (AJN), 2019 WL 1413999, at *2-4 (S.D.N.Y. Mar. 29, 2019) (quoting *Ganek*, 874 F.3d at 91).

In reviewing *Coleman* and *Carvalho*, as well as distillations of their analyses offered by sister courts in *Collins* v. *City of N.Y.*, No. 14 Civ. 8815 (AJN), 2019 WL 1413999, at *2-4 (S.D.N.Y. Mar. 29, 2019), *Corso* v. *City of N.Y.*, No. 17 Civ. 6096 (NRB), 2019 WL 1570807, at *2 (S.D.N.Y. Apr. 11, 2019), and *Blue,* 2018 WL 2561023, at *6-7, the Court understands that the Order of Protection does not constitute an actionable deprivation of liberty if there is no evidence to suggest that it was the result of the Injury-Based Charges, as opposed to the Non-Injury-Based Charges, the latter of which were supported by probable cause. *See Simsbury-Avon Pres. Soc'y, LLC*, 575 F.3d at 204 (holding that where "the burden of proof at trial would fall on the nonmoving party," the moving party can shift the initial burden by "point[ing] to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."). The Court notes at the outset that the mere fact that the Order of Protection was entered after C.S. was arraigned on both sets of charges does not automatically defeat his claim; in analogous situations, courts have held that plaintiffs were able to identify genuine disputes of fact as to whether the post-arraignment deprivations of liberty were the result of charges that lacked probable cause, even when those plaintiffs simultaneously faced other charges supported by probable cause. *See Collins*, 2019 WL 1413999, at *2-4; *see also Corso*, 2019 WL 1570807, at *2.

Here, however, C.S. offers no evidence to suggest that the Order of Protection was solely attributable to the Injury-Based Charges. *See Coleman*, 688 F. App'x at 58. Quite to the contrary, the filing of the Non-Injury-Based

Charges alone would have empowered the state court to impose the Order of
Protection; under New York law, "[w]hen a criminal action is pending involving
a complaint charging any crime or violation between ... parent and child ... the
court ... may issue a temporary order of protection[.]"  N.Y. Crim. Proc. Law
§ 530.12.  Nor is this an instance in which a jury could infer that a court
decided to impose a deprivation of liberty due to charges that lacked probable
cause rather than charges supported by probable cause, based on the fact that
the former were significantly more serious than the latter.  *See Corso*, 2019 WL
1570807, at *3 (finding it plausible that a single charge for a class A
misdemeanor was the cause of an accused's deprivation of liberty, where the
other charges the accused faced were for non-misdemeanor offenses that were
"frequently overlooked by prosecuting authorities altogether").  Here, both the
Injury-Based Charges and the Non-Injury-Based Charges included crimes of
equal seriousness, including crimes categorized as class A misdemeanors.  *See*
N.Y. Penal Law §§ 120.00(2) (assault in the third degree), 240.30(4) (aggravated
harassment in the second degree), 120.14(1) (menacing in the second degree),
265.01(2) (criminal possession of a weapon in the fourth degree).

Finally, the facts here differ from those in other cases where prosecutions
that included multiple criminal charges were dismissed when the prosecutors
learned that evidence supporting one of those charges had been falsified.  *See*
*Corso*, 2019 WL 1570807, at *3; *see also Collins*, 2019 WL 1413999, at *2-4.
In those cases, the courts found that a jury could infer from the dismissal of all
charges that the prosecutors would not have initiated the action without the

34

single charge that was supported by falsified evidence, and thus that any deprivation of liberty arising out of the prosecution was the result of that single charge (and, by extension, the falsified evidence). *See Corso*, 2019 WL 1570807, at *3; *see also Collins*, 2019 WL 1413999, at *2-4. It is true that the prosecution dismissed the Injury-Based Charges at the same time they dismissed the Non-Injury-Based Charges, but in this instance the concurrence of those two events does not suggest that the prosecution would not have brought the latter but for the former. The Criminal Charges as a whole were dismissed because Mortimer refused to cooperate with the prosecution and provide any testimony at all, preventing the prosecution from proving their case at trial. Mortimer's refusal to testify as to the Injury-Based Charges may have been due to the fact that she did not believe C.S. caused or attempted to cause her any injury. (Mortimer Dep. 117:17-118:15). But Mortimer did not express disagreement with the prosecutor's version of the underlying facts that would have supported a conviction as to the Non-Injury-Based Charges. (*Id.* at 66:13-69:8).[12] Thus, the timing of the dismissal of charges simply suggests that the prosecution dropped the charges after the sole witness refused to testify; it does not suggest that the dismissal of the Non-Injury-Based Charges was due to Hurst's allegedly misleading statement concerning the source of Mortimer's injuries.

---

[12]     Mortimer did take issue with whether the hammer pliers C.S. wielded could constitute a dangerous weapon. (Mortimer Dep. 117:17-118:15). But the prosecution did not need Mortimer to testify that the pliers were a dangerous weapon. That would have been a question for the jury. Mortimer would only have needed to testify that that C.S. intimidated her with the pliers, a fact that she does not contest. (C.S. 56.1 ¶ 38; Mortimer Dep. 68:7-69:8).

In short, the Court finds no evidence that the only cognizable deprivation of liberty that C.S. suffered — the Order of Protection — was the result of the Injury-Based Charges. Accordingly, summary judgment must be granted against C.S.'s malicious prosecution claim.[13]

> **b.    Summary Judgment Is Warranted as to C.S.'s Fair Trial Claim**

C.S.'s claim against Hurst for violation of his right to a fair trial is distinct from his malicious prosecution claim, but is subject to summary judgment for much the same reasons. "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti*, 124 F.3d at 130. To prevail, on a fair trial claim, a plaintiff must establish that the "[i] investigating official [ii] fabricate[d] evidence [iii] that [was] likely to influence a jury's decision, [iv] forward[ed] that information to prosecutors, and [v] the plaintiff suffer[ed] a deprivation of liberty as a result. *Soomro* v. *City of N.Y.*, 174 F. Supp. 3d 806, 815 (S.D.N.Y. 2016) (quoting *Jovanovic* v. *City of N.Y.*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order)). It is of no moment that a

---

[13]    Hurst also argues that he is entitled to qualified immunity from C.S.'s malicious prosecution claim, on the grounds that he had at least "arguable probable cause" at the time the criminal proceeding commenced. (Hurst Br. 16-19). *See generally Betts* v. *Shearman*, 751 F.3d 78, 82-83 (2d Cir. 2014). Because the Court has determined that Hurst did not violate C.S.'s constitutional right to be free from malicious prosecutions, it need not address Hurst's qualified immunity defense. *See Pearson* v. *Callahan*, 555 U.S. 223, 236 (2009) (holding that courts may exercise their discretion in determining whether to resolve constitutional issues before addressing the defense of qualified immunity).

plaintiff's case is never put before a grand or trial jury — this claim may be sustained where charges are dismissed before trial.  *See Ricciuti*, 124 F.3d at 130 (reversing summary judgment on denial of fair trial claim for charges dismissed before trial).

As discussed above, Hurst may only plausibly be said to have fabricated evidence with respect to the source of Mortimer's injury; if Mortimer told Hurst that she caused her own injury, Hurst's statement to police that was ambiguous as to the source of the injury was arguably misleading.  *See supra* at 17-21.[14]  The only deprivation of liberty that C.S. suffered is the Order of Protection.  And, for the reasons stated in the preceding section, no evidence exists to suggest that the Order of Protection was the result of the allegedly fabricated evidence.  *See supra* at 28-36.  Thus, summary judgment must be granted against C.S.'s claim that Hurst violated his right to a fair trial.

### 2. The Court Denies Wilson's Motion for Partial Summary Judgment

Turning now to Plaintiff Mortimer, the Court observes that her remaining claim is that Defendant Wilson violated her right to procedural due process by failing to provide her with constitutionally sufficient notice of the August 1, 2020 Proceeding, which ended with an order that C.S. be placed in non-kinship family care.  *Mortimer I*, 2018 WL 1605982, at *16-18.  The Court has already determined that Wilson's alleged failure to provide notice of the proceeding

---

[14]   Hurst does not address the issue of whether such an allegedly misleading statement by the police could constitute fabricated evidence.  (*See generally* Hurst Br.; Hurst Reply).  Ultimately the Court need not decide this issue and accepts for the sake of argument that Hurst's statement could be fabricated evidence.  Even so, as discussed herein, C.S.'s fair trial claim would fail.

could constitute a procedural due process violation, *id.*, and Wilson acknowledges that a disputed issue of fact exists as to whether Wilson provided Mortimer with such notice (Wilson Br. 2). Thus, Wilson does not seek summary judgment against Mortimer's procedural due process claim as a whole; she instead seeks a grant of partial summary judgment, dismissing Mortimer's claim for compensatory damages arising out of that alleged procedural due process violation. (*See generally id.*). For the reasons that follow, Wilson's motion is denied.

### a. Applicable Law

"Rights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests, and their contours are shaped by the interests they protect." *Carey* v. *Piphus,* 435 U.S. 247, 254 (1978). Damages awards in § 1983 suits therefore "must be considered with reference to the nature of the interests protected by the particular constitutional right in question," and accordingly, "the elements and prerequisites for recovery of damages appropriate to compensate injuries caused by the deprivation of one constitutional right are not necessarily appropriate to compensate injuries caused by the deprivation of another." *Id.* at 264-65. "Thus, the compensatory damages calculation for different constitutional violations turns on the nature of the injuries suffered even though the amount of compensatory damages awarded is in any event limited to the actual injuries suffered by the plaintiff." *Warren* v. *Pataki,* 823 F.3d 125, 143 (2d Cir. 2016).

"Because the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed ... the denial of procedural due process [is] actionable for nominal damages without proof of actual injury. *Carey*, 435 U.S. at 266-67. Actual damages for procedural due process violations "are based on the compensation for injuries that resulted from the plaintiff's receipt of deficient process." *Warren*, 823 F.3d at 143 (citing *Poventud* v. *City of N.Y.,* 750 F.3d 121, 135-36 (2d Cir. 2014) (en banc)).  According to the Second Circuit,

> To calculate such damages, courts must determine whether a different outcome would have been obtained had adequate procedural protections been given.  If the outcome would not have been different, the plaintiff is presumptively entitled to no more than nominal damages.  *See* [*P*]*oventud*, 750 F.3d at 135-36]*; see also Carey,* 435 U.S. at 262-63.  If, however, a plaintiff can show that he suffered mental and emotional distress caused by the denial of procedural due process itself (as opposed to the mental and emotional distress caused by, for instance, the incarceration that would have occurred absent the due-process violation), he is entitled to recover actual damages only to that extent.  *See Carey,* 435 U.S. at 263 (distinguishing between distress attributable to "the justified deprivation" and that caused by "deficiencies in procedure").

*Warren*, 823 F.3d at 143.

### b.    A Genuine Dispute Exists as to Whether the Outcome of the August 1, 2014 Proceeding Would Have Been Different If Mortimer Had Received Notice

In light of these well-established principles, Mortimer may be entitled to nominal damages regardless of whether she suffered any injury as a result of

the alleged violation of her right to procedural due process.  But her request for relief in the form of compensatory damages may only survive summary judgment if she can establish a genuine dispute as to whether: (i) she suffered mental and emotional distress caused by the lack of notice of the August 1, 2014 Proceeding; or (ii) the outcome of the Proceeding would have been different if she had received notice of it.

As to the first of these factors, Mortimer argues that she "incurred substantial loss in the form of financial, emotional, social, and psychological" damages.  (Mortimer Br. 6).  But Mortimer's argument is supported only by her own declaration that she suffered unlawful arrests, fear and worry over a missing child, financial loss, personal humiliation, impairment of reputation, and "humiliation stressors and trauma of family court litigation."  (Mortimer Decl. 9-10).  Mortimer's declaration appears to allude to other documentary evidence, but such documents are not provided to the Court in Mortimer's opposition papers.  Even if they had been provided, Mortimer does not attempt to establish that those injuries were caused by Wilson's failure to provide notice of the August 1, 2014 Proceeding and not by: (i) the unrelated arrests of Mortimer and C.S.; (ii) the investigation conducted by ACS; (iii) the initiation of Family Court proceedings (which would have happened whether or not Wilson provided notice of the August 1, 2014 Proceeding); or (iv) any number of other difficulties that existed wholly independent of Wilson's alleged failure to provide notice.  Thus, even if a genuine dispute exists as to whether Mortimer suffered mental and emotional distress, no evidence exists to establish that such

40

distress was caused by the alleged due process violation alone.  *See Warren*, 823 F.3d at 143.

The second avenue to actual damages proves more promising for Mortimer.  Mortimer claims that the petition for removal filed by ACS (Frank Decl., Ex. A (the "Petition")), which served as the basis for the Family Court judge's decision to remove C.S. to non-kinship family care on August 1, 2014, was replete with fabricated facts and misleading allegations.  (Mortimer Opp. 5-6).  According to Mortimer, the inaccurate facts in the Petition included, but were not limited to, the following:

(i)   The Petition states that Mortimer told the police that C.S. caused her finger laceration during the April 12, 2014 incident, but Mortimer told the police that she had accidentally caused her own injury (Petition ¶ 1(a); Mortimer Decl. 3);

(ii)  Contrary to the claims made in the Petition, Mortimer did not kick C.S. out of her home on July 23, 2014, without any plans for his welfare, and instead Mortimer and C.S. agreed that C.S. would stay with his grandmother for one week, as he frequently did (Petition ¶ 1(b)-(c); Mortimer Decl. 4-5); and

(iii) The Petition's claims about Mortimer's failure to provide adequate food and clothing were unsubstantiated (Petition ¶ 1(c); Mortimer Decl. 6-7).

Mortimer also argues that the Family Court judge was misled with regard to the extent to which Mortimer was made aware of or allowed involvement in ACS's investigation.  (*See generally* Mortimer Decl.).  Mortimer claims that Wilson frequently met with C.S. without her knowledge and consent, and that Mortimer was unable to participate in "family meetings" that Wilson proposed having with Mortimer and C.S., because the Order of Protection forbade the

two from interacting.  (*Id.*).  Had she been given constitutionally sufficient notice of the August 1, 2014 Proceeding, Mortimer claims that she would have attended the hearing and informed the judge of these issues.  According to Mortimer, the judge would not have entered the Temporary Removal Order if he had been presented with her side of the story.  (Mortimer Opp. 5-6).

It is true that Mortimer does not challenge with specificity the veracity of all, or even most, of the information provided in the Petition concerning Mortimer's alleged neglect of her son.  (*See generally* Mortimer Decl.). Nevertheless, drawing all permissible factual inferences in Mortimer's favor, were the jury to find Mortimer's testimony credible, they might determine that significant portions of the Petition were inaccurate.  *See Terry*, 336 F.3d at 137; *Rojas*, 660 F.3d at 104 (noting that a district court generally should not weigh the credibility of a witness).[15]  Further, a jury could find that, had she been given notice of the proceeding: (i) Mortimer would have attended the proceeding; (ii) she would have given the judge reason to doubt the allegations presented in the Petition and reason to believe that Mortimer had not been sufficiently involved in ACS's investigation; and (iii) the judge would not have

---

[15]    Wilson argues that she had probable cause to believe each allegation made in the Petition and that, based upon those allegations and the record available at the time, the Family Court judge's decision to remove C.S. to temporary non-kinship foster care was objectively reasonable.  (Wilson Reply 6-8).  The Court does not disagree.  The question at hand, however, is whether providing Mortimer with notice would have altered the outcome of the August 1, 2014 Proceeding.  Because Mortimer has provided testimony that the allegations contained in the Petition were false, and because the Court may not weigh Mortimer's credibility at this stage in the proceedings, the Court finds that a genuine dispute exists as to whether the outcome would have been altered if Mortimer had received notice of the proceeding.

entered the Temporary Removal Order.[16]  Based on this, and without passing

on whether the evidence "unmistakably favors one side or the other," *Simpson*,

793 F.3d at 265, the Court finds that a genuine dispute exists as to whether

the outcome of the August 1, 2014 Proceeding would have differed had Wilson

given Mortimer notice.

Wilson's arguments to the contrary are premised upon the law of the

case; Wilson claims that, because the Court dismissed Mortimer's substantive

due process claim in *Mortimer I*, Mortimer cannot show that she suffered any

injuries as a result of the alleged procedural due process violation.  (*See*

*generally* Wilson Br.; Wilson Reply).  It is true that the Court dismissed

Mortimer's substantive due process claim, finding that: (i) C.S.'s separation

from Mortimer between July 23, 2014, and August 1, 2014, was agreed to by

Mortimer and C.S., and thus not attributable to Wilson; and (ii) C.S.'s

separation from Mortimer after August 1, 2014, was the result of a Family

Court order, after which "any [substantive due process] liability for the

continuation of the allegedly wrongful separation of parent and child can no

longer be attributed to the officer who removed the child."  *Mortimer I*, 2018 WL

1605982, at *14-15 (quoting *Southerland*, 680 F.3d at 152).  But Mortimer's

procedural due process claim would not hold Wilson liable for the allegedly

wrongful separation following the entry of the Temporary Removal Order.

---

16      The parties agree that the Family Court ultimately denied ACS's petition to have C.S. permanently removed from Mortimer's care.  (*See* Wilson Reply 7).  Because the Court was not provided with the text of the Family Court's decision on this matter, it knows not why this result was reached.  Nevertheless, the fact that permanent removal was denied supports, however weakly, Mortimer's argument that she could have persuaded the Family Court that a temporary removal order was unnecessary if she had participated in the August 1, 2014 Proceeding.

Instead, Mortimer seeks to hold Wilson liable for her alleged failure to provide Wilson with notice of the August 1, 2014 Proceeding, which preceded the Temporary Removal Order.  In short, Wilson's attempt to collapse Mortimer's right to procedural due process into her right to substantive due process must fail.

### c.   The *Rooker-Feldman* Doctrine Does Not Bar Mortimer from Seeking Compensatory Damages

Finally, Wilson's opening brief contains a single sentence that references the *Rooker-Feldman* doctrine.  However cursory the argument might be, the Court understands Wilson to argue that Mortimer cannot establish that the outcome of the August 1, 2014 Proceeding would have been different had she been given notice, because the *Rooker-Feldman* doctrine prohibits her from attacking the validity of the Temporary Removal Order in federal court.  (Wilson Br. 5).  In the interest of completeness, the Court addresses that argument. The Court agrees that the *Rooker-Feldman* doctrine would prevent Mortimer from seeking to nullify the Temporary Removal Order, but disagrees that Mortimer is seeking to do that here.

The *Rooker-Feldman* doctrine bars a losing party in state court "from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights."  *Johnson* v. *De Grandy,* 512 U.S. 997, 1005-06 (1994).  The doctrine "recognizes that 28 U.S.C. § 1331 is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments, which Congress has reserved

to [the Supreme] Court, *see* [28 U.S.C] § 1257(a)." *Verizon Md., Inc.* v. *Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 644 n.3 (2002). The doctrine occupies "narrow ground," *Exxon Mobil Corp.* v. *Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005), and has been limited to cases satisfying a four-part test: (i) the federal-court plaintiff lost in state court; (ii) the plaintiff "must complain of injuries caused by a state-court judgment;" (iii) the plaintiff "must invite district court review and rejection of that judgment;" and (iv) "the state-court judgment must have been rendered before the district court proceedings commenced." *Green* v. *Mattingly,* 585 F.3d 97, 102 (2d Cir. 2009) (alteration, citations, and internal quotation marks omitted); *see also McKithen* v. *Brown,* 626 F.3d 143, 154 (2d Cir. 2010) (outlining the *Rooker-Feldman* test)

The fourth factor of the *Rooker-Feldman* test is plainly met here: the Temporary Removal Order was entered on August 1, 2014, before the proceedings in this Court commenced on September 11, 2015. And the Court accepts for the sake of argument that the first factor is also met, and that the entry of the Temporary Removal Order constituted a loss for Mortimer in state court.[17] The question then becomes whether Mortimer's procedural due

---

[17]     It is not clear that Mortimer was a "state court loser" for the purposes of the *Rooker-Feldman* doctrine. In *Green* v. *Mattingly,* 585 F.3d 97, 102 (2d Cir. 2009), a family court held an *ex parte* proceeding and entered a temporary removal order, removing the plaintiff's child from her custody. *Id.* Four days later, the plaintiff contested the order and the family court issued a superseding order returning the child to the plaintiff. The family court then adjourned the proceedings in "contemplation of dismissal" and the petition was automatically dismissed. *Id.* The Second Circuit found that the plaintiff had not lost in state court because, "[a]lthough there was no final adjudication in plaintiff's favor, there was also no final 'order of disposition' removing her child and plaintiff secured the reversal of the one form of interlocutory relief entered against her." *Id.* (internal citation omitted). The Court has not been provided with sufficient information to determine whether a final order of disposition was granted in Mortimer's favor, or whether the Temporary Removal Order was reversed before it expired. But the

process claim — which is premised on Wilson's actions before the Temporary Order of Removal was entered, and which seeks damages based on whether the Order would not have been entered had Mortimer been afforded due process — complains of an injury caused by the Order, and invites district court review and rejection of the Order.  If both of these factors are met, *Rooker-Feldman* would apply, barring Mortimer from seeking compensatory damages on the theory that the outcome of the August 1, 2014 Proceeding would have been different if she had been afforded procedural due process.

The Court finds that neither of these factors is met.  First, Mortimer's surviving claim does not allege that her injury was caused by a state court order.  "[T]he applicability of the *Rooker-Feldman* doctrine turns not on the *similarity* between a party's state-court and federal-court claims (which is, generally speaking, the focus of ordinary preclusion law), but rather on the *causal relationship* between the state-court judgment and the injury of which the party complains in federal court."  *McKithen* v. *Brown,* 481 F.3d 89, 98 (2d Cir. 2007) (emphases in original) (citing *Hoblock* v. *Albany Cty. Bd. of Elections,* 422 F.3d 77, 87 (2d Cir. 2005) ("[A] plaintiff who seeks in federal court a result opposed to the one he achieved in state court does not, for that reason alone, run afoul of *Rooker-Feldman*.").  Indeed, the *Rooker-Feldman* doctrine does not apply where a plaintiff brings an independent claim that was not caused by a state court judgment, even if that claim would deny a legal conclusion that a state court has reached in a case to which he was a

Court need not decide whether Mortimer can be said to have lost in state court, because, as stated herein, the *Rooker-Feldman* doctrine would not otherwise apply.

party.  *Ezagui* v. *City of N.Y.*, 726 F. Supp. 2d 275, 290 (S.D.N.Y. 2010) (quoting and summarizing *Exxon Mobil,* 544 U.S. at 293).  Although Mortimer's claim may touch upon the Temporary Removal Order, the underlying cause of her alleged injury is Wilson's failure to give notice, and not the Order itself.  Sister courts have found that similar claims do not satisfy the second *Rooker-Feldman* factor.  *See Ezagui*, 726 F. Supp. 2d at 290 ("Here, Plaintiff does not complain of an injury caused by a state court judgment; instead, he complains of an injury caused by Defendants' failure to give him notice of his due process rights related to the seizure and retention of his vehicle."); *see also Vossbrinck* v. *Accredited Home Lenders, Inc.*, 773 F.3d 423, 427-28 (2d Cir. 2014) (acknowledging that a complaint can allege injury caused by a fraudulent statement made to a court, which statement resulted in an allegedly inaccurate state court judgment, without alleging that the injury was caused by the inaccurate state court judgment such that it would be barred by the *Rooker-Feldman* doctrine).

Nor is the third *Rooker-Feldman* factor met, because Mortimer does not seek to have the Court review and reject the Temporary Removal Order.  "In the child custody context, in order to satisfy this [*Rooker-Feldman*] requirement, a plaintiff must 'plainly' be seeking to 'undo the [Family Court] judgment.'" *McKnight* v. *Middleton,* 699 F. Supp. 2d 507, 515 (E.D.N.Y. 2010) (quoting *Green* v. *Mattingly,* 585 F.3d 97, 102 (2d Cir. 2009).  The Second Circuit has stated, in *dicta,* "that claims challenging general procedures would not be barred by *Rooker-Feldman* unless they seek modification of the specific orders

affecting the plaintiff." *Schweitzer* v. *Crofton*, 935 F. Supp. 2d 527, 542
(E.D.N.Y. 2013), *aff'd*, 560 F. App'x 6 (2d Cir. 2014) (summary order) (citing
*McNamara* v. *Kaye*, 360 F. App'x 177, 177 (2d Cir. 2009) (summary order)
("Inasmuch as [the plaintiff's] claims challenge the procedures applied in all
attorney disciplinary proceedings and seek damages and prospective relief
rather than a modification of her suspension or reinstatement orders, her
claims would not appear to be barred by *Rooker-Feldman.*")).  Furthermore, in
the analogous case of *Green*, the Second Circuit held that *Rooker-Feldman* did
not apply to a plaintiff's challenge of a temporary removal order where
plaintiff's custody over her child had been restored.  585 F.3d at 102.  The
court found that such a challenge could not invite review and rejection of the
temporary removal order:  "The only conceivable 'judgment' against plaintiff —
the temporary removal of her child — has already been undone."  *Id.*

Read together, this case law "suggest[s] that a plaintiff's claims seeking
only monetary damages … against court procedures rather than modification of
a family court's temporary custody or other orders would not run afoul of
the *Rooker-Feldman* doctrine."  *McKnight*, 699 F. Supp. 2d at 515.  Here,
Mortimer seeks damages arising out of the alleged procedural due process
violation, but she does not seek to have the Temporary Removal Order rejected,
undone, or otherwise modified.  Indeed, the Temporary Removal Order has long
since expired, a permanent removal order was denied, and C.S. has aged into
adulthood; as such, the Order could not be undone.  *Green*, 585 F.3d at 102.
For these reasons, the *Rooker-Feldman* doctrine does not apply to bar

Mortimer's procedural due process claim, nor does it bar her from recovering

compensatory damages.[18]

---

[18]    At the risk of addressing further arguments that Wilson may not have intended to raise, the Court notes a recent decision by a sister court, which found that the *Rooker-Feldman* doctrine precluded plaintiffs from receiving compensatory damages for a procedural due process claim on the theory that a state court would have reached a different outcome if adequate process had been provided.  *Dorce* v. *City of N.Y.*, No. 19 Civ. 2216 (JGK), 2020 WL 2521320, at *5-6 (S.D.N.Y. May 17, 2020).  In *Dorce*, the plaintiffs' property had been foreclosed upon pursuant to an *in rem* proceeding.  *Id.* at *2-4.  The plaintiffs brought a procedural due process claim, alleging that they had received insufficient notice of the *in rem* proceeding and seeking compensatory damages equal to the value of the property they had lost.  *Id.* at *5.  The court saw through the plaintiffs' attempts to plead their way around *Rooker-Feldman*; though the plaintiffs argued that their injury was caused by the lack of notice, the fact that they sought damages equal to the property value lost in the proceedings betrayed that their actual injury was caused by the state court judgment of foreclosure.  *Id.*  The *Dorce* court also determined that the plaintiffs sought to have it review and reject the state court judgment, because they would only be entitled to compensatory damages if the outcome of the *in rem* proceeding would have been different had they received notice.  *Id.* at *6.  "This would require the Court to adjudicate 'the validity of the foreclosure,' which was "already fully adjudicated in the state-court proceeding."  *Id.* (quoting *Gonzalez* v. *Deutsche Bank Nat. Tr. Co.*, 632 F. App'x 32, 33-34 (2d Cir. 2016) (summary order)).

*Dorce* is easily differentiated from the case at hand with regard to the relief the plaintiffs seek.  The *Dorce* plaintiffs sought full compensation for their lost property — thus tying their injury to the state court judgment foreclosing their property.  But Mortimer seeks damages to compensate her for the alleged due process violation, which would not undo the effects of the Temporary Removal Order.  The former satisfies the second requirement of the *Rooker-Feldman* doctrine, while the latter does not.

The Court also finds that, in this instance, the third *Rooker-Feldman* factor would not be met.  Determining whether the results of the August 1, 2014 Proceeding would have been different had Mortimer been given notice would not require the Court to adjudicate the validity of the Temporary Removal Order.  The Court would have to analyze the Petition and evidence provided to the Family Court judge upon which the Temporary Removal Order was based.  But the Court would not take the additional step of determining whether the Temporary Removal Order was correctly or erroneously issued based upon that evidence.  Instead, the Court would embark on a purely hypothetical exercise of determining whether the result would have been different had Mortimer appeared at the hearing and offered new testimony that was not actually available to the Family Court judge.  More importantly, a decision that the outcome would have been different had Mortimer been given notice would not constitute a rejection of the Temporary Removal Order.  In short, "[t]his is not the type of appellate review of state-court decisions contemplated by the *Rooker-Feldman* doctrine."  *Great W. Mining & Mineral Co.* v. *Fox Rothschild LLP*, 615 F.3d 159, 173 (3d Cir. 2010) ("[W]hile Great Western's claim for damages may require review of state-court judgments and even a conclusion that they were erroneous, those judgments would not have to be rejected or overruled for Great Western to prevail."); *see also Nesses* v. *Shepard*, 68 F.3d 1003, 1005 (7th Cir. 1995) ("But if he claims, as he does, that people involved in the decision violated some independent right of his ... then he can, without being blocked by the *Rooker-Feldman* doctrine, sue to vindicate that right and show as part of his claim

## CONCLUSION

For the reasons set forth above, Hurst's motion for summary judgment is GRANTED in full.  Wilson's motion for summary judgment is DENIED.  The Clerk of Court is directed to terminate the motions pending at docket entries 222 and 227, and to terminate Hurst as a party to the case.

Wilson and Mortimer are hereby ORDERED to appear for a telephonic conference concerning next steps in this proceeding on **August 11, 2020**, at **2:00 p.m**.  The dial-in information is as follows:  At 2:00 p.m., the parties shall call (888) 363-4749 and enter access code 5123533.  Please note, the conference will not be available prior to 2:00 p.m.

SO ORDERED.

Dated:       July 7, 2020
              New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

***Sent by First Class Mail to:***
Kim Mortimer
60 West 91st Street, Apt A
New York, NY 10024

***Sent by Electronic Mail to:***
C█████ S█████
██████████████████

---

for damages that the violation caused the decision to be adverse to him and thus did him harm.").

50